1               IN THE UNITED STATES DISTRICT COURT

2               IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4

    EURAND, INC., CEPHALON,        :   CIVIL ACTION
5   INC., and ANESTA AG,           :
                                    :
6                  Plaintiffs,      :
                                    :
7        vs.                        :
                                    :
8   MYLAN PHARMACEUTICALS,          :
    INC., MYLAN INC., and BARR      :
9   LABORATORIES, INC.,             :
                                    :
10                 Defendants.      :   NO. 08-00889 (SLR)
    ---------------------------
11  EURAND, INC., CEPHALON,         :   CIVIL ACTION
    INC., and ANESTA AG,            :
12                                  :
                   Plaintiffs       :
13                                  :
            v.                      :
14                                  :
    IMPAX LABORATORIES, INC.,       :
15                                  :
                   Defendants       :   NO.  09-00018 (SLR)
16

17                          - - -

18                          Wilmington, Delaware
                            Tuesday, October 13, 2009
19                          4:30 o'clock, p.m.

20                          - - -

21  BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

22                          - - -

23

24                          Valerie J. Gunning
                            Official Court Reporter
25

1    APPEARANCES:

2            FISH & RICHARDSON P.C.
             BY:  WILLIAM J. MARSDEN, JR., ESQ.
3

4                    -and-

5

             FISH & RICHARDSON P.C.
6            BY:  JOHN D. GARRETSON, ESQ., ESQ.
                  (New York, New York)
7

8

9                 Counsel for Plaintiffs
                  Eurand, Inc., Cephalon, Inc. and Anesta AG
10

11

12           COOLEY GODWARD KRONISH LLP
             BY:  TRYN T. STIMART, ESQ.
13                (Washington, D.C.)

14                   -and-

15

16           COOLEY GODWARD KRONISH LLP
             BY:  RICHARD S. SANDERS, ESQ.
17                (Boston, Massachusetts)

18

19                Counsel for Plaintiff
                  Eurand, Inc.

20

21

22

23

24

25

```
 1    APPEARANCES (Continued):

 2
                 POTTER, ANDERSON & CORROON LLP
 3               BY:  DAVID E. MOORE, ESQ.

 4
                         -and-
 5

 6               WILEY REIN LLP
                 BY:  MARK A. PACELLA, ESQ.
 7                    (Washington, D.C.)

 8
                     Counsel for Defendants
 9                   Mylan Pharmaceuticals, Inc. and Mylan, Inc.

10

11               PHILLIPS, GOLDMAN & SPENCE
                 BY:  JOHN C. PHILLIPS, JR., ESQ.
12

13                       -and-

14
                 WINSTON & STRAWN LLP
15               BY:  JULIA MANO JOHNSON, ESQ.
                      (Chicago, Illinois)
16

17                   Counsel for Defendant
                     Barr Laboratories, Inc.
18

19

20               MORRIS JAMES LLP
                 BY:  MARY B. MATTERER, ESQ.
21

22
                     Counsel for Defendant
23                   Impax Laboratories, Inc.

24                       - - -

25
```

```
 1                    P R O C E E D I N G S

 2

 3               (Proceedings commenced in the courtroom,

 4    beginning at 4:30 p.m.)

 5

 6               THE COURT:  Good afternoon, everyone.

 7               (Counsel respond, "Good afternoon, your Honor.")

 8               THE COURT:  If you care to reintroduce folks,

 9    you're welcome to do that, or we can just get started.

10               MR. MARSDEN:  Good afternoon, your Honor.

11    William Marsden, from Fish & Richardson, on behalf of all of

12    the plaintiffs.

13               With me, my colleague, John Garretson, also from

14    Fish & Richardson and also with me today are Tryn Stimart

15    and Rich Sanders from the Cooley Godward firm.  They

16    represent only Eurand.

17               THE COURT:  All right.  Thank you very much.

18    Welcome.

19               MR. MOORE:  Good afternoon, your Honor.  Dave

20    Moore, from Potter Anderson.  And with me to the from Wiley

21    Rein is Mark Pacella.

22               THE COURT:  How are you?

23               MS. MATTERER:  Good afternoon your Honor.

24    Matter Matterer, from Morris James, on behalf of Impax

25    Laboratories today.
```

1          THE COURT:  All right.  Thank you.

2          MR. PHILLIPS:  Good afternoon, your Honor.  Jack

3    Phillips, on behalf of Bar Labs, and with me is Julia

4    Johnson of the law firm of Winston & Strawn.

5          THE COURT:  All right.  Thank you very much.

6          Why don't we start with plaintiffs' counsel in

7    terms of what we need to address today.

8          MR. GARRETSON:  Thank you, your Honor.  John

9    Garretson, for plaintiffs.

10          We have two major issues to discuss today, one

11   with respect to Mylan that I believe your Honor has received

12   a couple two-page letters briefs on, and then we also have a

13   follow-up discovery issue from the last conference we had

14   before your Honor on September 15th, relating to electronic

15   discovery from Impax.

16          Our suggestion, at your Honor's pleasure,

17   would be to proceed with the issue with respect to Mylan

18   first, because you have the briefs and maybe we could go for

19   that.  If you would like to hear from us first, we'd be

20   happy to present plaintiffs' position.  It is Mylan's issue

21   that they are seeking discovery on.

22          THE COURT:  Why don't we hear from counsel for

23   Mylan in that regard.

24          MR. GARRETSON:  Thank you, your Honor.

25          MR. PACELLA:  Thank you, your Honor.  We

1    appreciate the opportunity to brief you on this and discuss

2    briefly the issue that was deferred last month.

3           As stated in our letter, your Honor, we're

4    really seeking four or five narrow categories, some of which

5    are interrelated, so it's not really five categories, but

6    we're trying to be as reasonable as possible.  We're not

7    looking for the world.  We're looking for essentially --

8    well, just to back up.  I think your question last month

9    was, why is this information relevant.  But we've tried to

10   focus the request to what is truly minimally relevant.  We

11   believe it's a narrower focused request than what would

12   really be relevant.

13          But the relevance here is not in terms of the

14   documents being prior art themselves.  That's one thing that

15   needs to be clear, in terms of the secret documents.

16          As stated in our brief, and as we discussed last

17   month, your Honor, the documents at issue relate to

18   formulations using this Diffucaps platform technology.  And

19   as you can see in Exhibit A to our letter brief, it's a,

20   sort of generic, so to speak, platform that different drugs

21   can be used and it can be manipulated to attain various

22   release rates.

23          And the issue in this case -- one of the issues

24   is the specific release rates of the claimed formulation

25   when tested according to certain methods.  And it's not the

1    only method that could be used to test.  It's the one that

2    the plaintiffs decided to choose respecting -- with respect

3    to the dissolution rate in vitro, in a test tube.

4              And so what we're really looking for is

5    documents that will show using the same platform, No. 1,

6    first and foremost, is the inherent properties of the

7    formulations that were, in fact, in the prior art.

8              So if you look at the Schering case that we

9    cited, that's a case on inherent anticipation, which makes

10   it quite clear that the Federal Circuit does not limit

11   relevant documents on issues of validity to prior art.  It

12   can be a non-public document that shows what's inherent in

13   the prior art.

14             And although we have not cited any case, your

15   Honor, I can cite one or two, if you'd like, here, but just

16   to be clear on this inherency concept, it applies equally to

17   what a prior art reference shows for purposes of obviousness

18   as well as for anticipation.  It's not limited to

19   anticipation, even though the Schering case is an

20   anticipation case.

21             And so there are at least two cases on that

22   principle.  In re Grasselli and In re, Napier, both Federal

23   Circuit cases that say that the concept of inherency is

24   relevant to both obviousness and anticipation.

25             So what we're really looking for, your Honor,

1    is a subset, three products that we know were in the prior

2    art.  Amitriptyline, methylphenidate and propanolol.  And

3    there may be others.

4              And that's why we were asking for the first

5    category, which is just documents sufficient to identify

6    these other formulations, because they may be other

7    formulations that are in the prior art that plaintiffs

8    know about that we don't and it's in their possession,

9    it's not burdensome.  And so that request would allow us to

10   conduct discovery on those formulations if we can discover

11   those.

12             With respect to the specific three formulations,

13   we're not looking for every document related to those.

14   We're only looking for lab notebooks and specific documents

15   of the dissolution testing, which is dissolution testing in

16   in vivo bioavailability, which are the two characteristics

17   that are in the claims of the patent-in-suit that will also

18   be found inherently in the prior art formulations.

19             And so we're asking for those three specific

20   formulations.  Just development reports, lab reports,

21   not every piece of paper that has the words, or that

22   deal with those formulations.  So it's not asking for the

23   world.

24             The two cases that the plaintiffs cited in

25   their brief, and they'll probably -- may expand on this

1    from their point of view, but we would submit that those

2    cases are not on point.  Those cases address the issue of

3    whether a submission of something that was done in secret

4    by the patentee in an IDS, for instance, in the Riverwood

5    case, is prior art, is an admission that that is prior art.

6    We're not alleging that any of this testing and development

7    of these other prior art formulations is itself prior art.

8    We're alleging, in line with the Schering case and other

9    cases, that the information about the inherent

10    characteristics as tested is relevant to what's disclosed

11    in the prior art, and that's a totally different concept.

12    It's not addressed by other of the cases that the plaintiffs

13    have cited.

14            As far as amitriptyline goes, the response

15    that the plaintiffs made in their letter was that, I

16    believe, "Eurand, Inc. has never attempted to formulate an

17    amitriptyline product," and "There's no indication

18    that the named inventors were ever involved in such

19    formulations."

20            And, again, you know, we asked them to just

21    represent whether there are, in fact, any documents in the

22    plaintiffs' possession, custody or control that would show

23    that they had knowledge of these things and that they had

24    tested these things and they have not checked.  That's at

25    least our understanding based on discussing.

1          And so all we're asking for is for them to

2     search and collect the documents.  If they don't believe

3     there was this big project, it's certainly not burdensome to

4     look.  And to the extent that those documents exist, they

5     could be highly relevant to what the inventor of the

6     patent-in-suit knew when he was prosecuting this patent

7     application in suit.

8          And we now have this inequitable conduct claim

9     on the '215 patent.  We also need discovery on what else --

10    which was not submitted to the Patent Office.  We also know

11    that Eurand, somewhere else, perhaps -- plaintiffs have told

12    us it was in Italy -- a Eurand-related entity was working on

13    amitriptyline in the Diffucaps, and we know that one of the

14    named inventors in the patent-in-suit at least had

15    conversations back and forth, was working on projects or

16    discussing projects with this other entity.

17         And so it's perfectly reasonable to expect that

18    there could have been some discussion about this

19    amitriptyline product, but if they don't look, we can't

20    know.  You know, this is information that's all in their

21    sole possession and control.

22         So just to sum up, your Honor, I believe that

23    there are several -- I'm sorry.  I should back up.  There's

24    one other category of documents other than these

25    amitriptyline development -- amitriptyline, propanoyl and

1    methylphenidate development documents that we want, and this

2    is a very narrow category that's new.  It's still within the

3    document requests that we propounded, but it's now

4    particularly relevant in view of the Court's allowance of

5    our motion to amend for inequitable conduct, which is

6    documents to, from, or generated by the two inventors.

7    There are only two named inventors on the patent-in-suit.

8    We know that one of them was involved in the methylphenidate

9    project.  He's a named inventor on that.  The other, we

10   don't know.

11           But, again, we are looking for just documents

12   from those two individuals relating to the three specific

13   projects, which would be highly relevant to what they

14   knew when they were disclosing or not disclosing things

15   to the Patent Office, including the methylphenidate

16   formulation that was the subject of one of the inventor's

17   patents.

18           And, finally, we have one category of documents

19   that the Court was told last month that we had, and we

20   don't, which is the nonconfidential documents relating to

21   methylphenidate, propanolol and amitriptyline.  And if you

22   read the transcript, counsel for the plaintiff said the

23   whole problem we have with all of these documents is that

24   they're secret, they're highly sensitive.  To the extent

25   that there are these publicly nonconfidential documents,

1    defendants have those, and we have not been able to find

2    those.

3              And based on our discussion with the plaintiffs,

4    it does not appear that they looked for those, so that's

5    another category of documents that does not even implicate

6    the alleged concern about the sensitivity of the documents.

7              So we would ask the Court to assist us in

8    obtaining those documents as well.

9              THE COURT:  All right.  Thank you.

10             Let's hear from counsel for plaintiff.

11             MR. PACELLA:  Thank you, your Honor.

12             MR. GARRETSON:  Thank you, your Honor.

13             What we're really talking about here is opening

14   up discovery to a bunch of other drugs and a bunch of other

15   formulations.  At least three.  Mr. Pacella does not want to

16   limit it to that.  We'll get a big list of all the drugs

17   that have ever been put on Diffucaps and then have discovery

18   on the formulation and bioavailability and other data on

19   those.  It's just, as Mr. Pacella admitted during the last

20   hearing, the genesis of this is fishing around for prior

21   art, and that is improper.

22             Diffucaps is not the patent here.  The patent

23   is not on Diffucaps.  Diffucaps is a trade name.  A bunch

24   of drugs have been put -- as used, broadly speaking,

25   Diffucaps technology, and are formulated a whole bunch of

1    different ways to achieve different release profiles and a

2    whole bunch of other things.  It is not -- you know, the

3    patent is not on Diffucaps.  The patent is on

4    cyclobenzaprine.  The patent claims are limited to

5    cyclobenzaprine formulations.

6            We are talking about discovery into a whole

7    number of other drugs.  Propanolol, methylphenidate and

8    amitriptyline, for starters.  And I think it's also

9    important to keep in mind that these drugs do not stand on

10   an equal footing.

11           Mr. Pacella referenced the inequitable conduct

12   allegation that has been made.  That has been made with

13   respect to a public patent on only one of those drugs, and

14   the information is there in the patent relating to whether

15   or not there's inequitable conduct or failure to disclose.

16   The information is there.  It's public, there's no need to

17   start a fishing expedition into documents underlying that or

18   underneath that.

19           With respect to amitriptyline, this is something

20   they say we have not done a search for this.  The context is

21   important here.  They did not bring up amitriptyline as a

22   potential prior art issue until the close of document

23   discovery, in their invalidity contentions.  It wasn't in

24   their Paragraph 4.  It wasn't brought up at any time

25   previous.  What happened was, the prior art in all of the

1    defendant's Paragraph 4 letters was submitted to the Patent

2    Office for claims for other applications, and the Patent

3    Office found they did not affect patentability.  And so then

4    what happened is, well, we've got to come up with something

5    else.

6              Now, Mylan could have brought up amitriptyline

7    a long time ago.  They have marketed an amitriptyline

8    product themselves for over 20 years, and only now are we

9    hearing that we need discovery into amitriptyline or we need

10   discovery into methylphenidate or into propanoyl, which Mr.

11   Pacella really didn't talk about.  They also have a

12   commercial propanoyl product.

13             There's no mystery here as to what is out there.

14             As for the prior art, Mr. Pacella mentioned that

15   we had cited two cases in our brief, the Riverwood case and

16   the Life Technologies case, and I believe, consistent with

17   the prior rulings here, that those cases clearly show

18   that getting into these drugs for purposes of trying to

19   figure out if an obviousness analysis, if they can be used

20   on one side or the other, an obviousness analysis, is not

21   appropriate.  Those Federal Circuit cases very clearly say,

22   you can't use these as prior art and should not be inquiring

23   into them.

24             As for the Schering case that Mr. Pacella

25   raises, that's an in inherency case, that's an anticipation

1    case.

2                The arguments that are being made here by Mylan

3    relate to obviousness.  And, again, I stress this.  The

4    patent-in-suit relates to cyclobenzaprine, not these other

5    drugs.

6                And they are trying to rely on the Schering

7    case regarding inherency, where there, a metabolite was

8    involved, a direct -- when you put it in the body, this is

9    the drug that comes out.  There's no such allegation here.

10   There has been no factual support for anything with respect

11   to amitriptyline.  In fact, we have asked Mylan to withdraw

12   their allegation with respect to amitriptyline because they

13   have provided no factual support whatsoever for anything

14   relating to either an anticipation or an obviousness

15   defense.

16               And, finally, these documents with respect to

17   methylphenidate, what the inventors knew or didn't know,

18   this is the classic kind of looking for materials to bolster

19   a case.

20               I would just say that with respect to

21   methylphenidate, that stands on a different footing than

22   amitriptyline and propanoyl.  There are no allegations of

23   inequitable conduct with respect to those two drugs, and

24   lumping it all together and saying that we should do those

25   three drugs for starters and let's see if there are any

1    other documents on any other drugs on Diffucaps, let's open

2    that front as well, that does not seem to make sense to us,

3    your Honor.

4              THE COURT:  I do have one question, and I want

5    to make sure I'm correct in what's going on here.

6              The defendant has argued that plaintiffs intend

7    to rely on various secondary considerations, such as failure

8    of others and prior unsolved need, which suggests the work

9    leading to the '793 patent was both difficult and necessary.

10   Internal documents that confirm Mylan's contention that the

11   '793 formulation was an obvious extension of Eurand's

12   existing platform requiring non-inventive routine

13   experimentation would be probative of a prima facie case of

14   obviousness and would also directly rebut plaintiffs'

15   secondary factors contentions.

16             Now, is it plaintiffs' response that because

17   this information is not prior art, because it was done by

18   the same inventors, that that paragraph does not really

19   apply?  That it's incorrect as a matter of law?

20             MR. GARRETSON:  It really does not apply, and I

21   have not heard any citation of case law by Mylan that it

22   should be relevant if you're alleging secondary

23   considerations.

24             The documents, the entire development project

25   for the cyclobenzaprine formulation at issue in this case,

1    have been produced.  To the extent that any cyclobenzaprine

2    development documents reference other drugs, that material

3    is in the production.  So the entire history of the

4    development of this formulation is there, has been produced.

5    Lab notebooks, development documents, e-discovery.

6         So I have not -- I don't believe that there's

7    any law that says that you have to go beyond that.  If you

8    are saying, look, that process had its bumps and fits and

9    was difficult, that if the universe of documents has been

10   produced relating to that project, that you go beyond that

11   to other drugs.

12        THE COURT:  Well, perhaps my problem is,

13   although you have tried to explain it to me, I don't really

14   understand how the Diffucaps technology ties all of these

15   drugs together.  And you did respond the way I expected you

16   to.

17        If, in fact, there is technology and that all

18   of these drugs, the extended release dosage forms of these

19   drugs, have something in common, I guess that is what I'm

20   not sure about.  If they do -- do they have something in

21   common or not, really?

22        MR. GARRETSON:  In a very basic level, yes, but

23   that does not go to what we're talking about in the patent

24   claims.  At a basic level, the Diffucaps is a trade name.

25   It refers to, you take an inert bead and you coat the drug

1    on it, and then you put an E.R., an extended release coating

2    on top of that.

3              And there are a lot of factors that you can

4    vary, that you can add to, that go way beyond that, that all

5    fall under the general umbrella of Diffucaps.  It has

6    nothing to do with this case, it has nothing to do with

7    these patents claims.  It's a trade name.  And if we're

8    talking about all drugs that might use some element of

9    Diffucaps technology, that is opening a huge front and is

10   very, very burdensome and we believe has nothing to do with

11   the actual issues in this case.

12             THE COURT:  Well, certainly, generally,

13   different discovery into different drugs and their

14   development, I generally don't allow that sort of discovery.

15   What the defendants are hanging their argument on is the

16   fact that they do have something in common.  You're saying

17   that that commonality is so basic, that it really won't lead

18   to any relevant information?

19             MR. GARRETSON:  That's right, your Honor, and a

20   huge concomitant cost and burden given this is what Eurand's

21   business is, or a component of the business, a very large

22   component of other drugs for other entities.

23             THE COURT:  And I guess, is there any way, or

24   any limited discovery that -- and maybe it has already been

25   produced -- but, generally, the defendant counsel won't

1    necessarily just accept what you have said.  My question is

2    whether there is any limited discovery that can be

3    proffered, pursued, produced, that basically confirms that

4    proposition, which would put an end to any further discovery

5    requests of this type and this breadth.

6         MR. GARRETSON:  I think the Exhibit A to their

7    letter actually kind of addresses that.  It gives a

8    description of Diffucaps and talks about how broad it is.

9    I'm not sure -- there's a list of factors on the second

10   page.  It talks about seven, eight, nine bullet points of

11   different elements of this general technology.  And there's

12   a reference on the first page, in the last paragraph, to all

13   sorts of different release profiles far beyond what we're

14   talking about here in the patent claims.

15        The patent claims talk about two, four hours,

16   eight hours, twelve hours, particular percent release.

17   Look at Diffucaps.  We're talking about pulsatile release,

18   immediate release, sustained release.  It just goes to the

19   breadth of Diffucaps.  It's a stalking horse for something

20   that's not appropriate.  And so it's hard for me to say, oh,

21   we could give some sort of discovery on Diffucaps that would

22   address Mylan's concerns given the breadth of what we're

23   talking about here.

24        THE COURT:  All right.  Let's hear from

25   defendants.

1          MR. GARRETSON:  Thank you, your Honor.

2          MR. PACELLA:  Your Honor, could I just address a

3     couple of points?

4          THE COURT:  Yes.  I mean, I have to say that I'm

5     generally not -- I'm generally fairly cynical about wide-

6     ranging discovery into issues whose relevance are barely

7     noticeable by me, and your category embraces that type of

8     discovery.

9          It seems to me that if the claims in the patent

10    are very specific claims as to a very specific drug, then

11    I'm not confident that it is appropriate for you to have the

12    wide-ranging discovery despite your very articulate

13    argument.  I am very cynical and not convinced yet that this

14    is appropriate.

15         So I will give you another chance.

16         MR. PACELLA:  Thank you very much, your Honor.

17         And I understand your concern about these sorts

18    of things in general, but this is a very specific case of --

19    and if you look at Exhibit A, I think the plaintiffs pointed

20    you to that and said, well, this is what shows why there's

21    not this commonality, but really, we would submit, it shows

22    exactly the opposite.

23         We know that basically what they've done is

24    they've taken the little sphere at the bottom.  Maybe you

25    can put in -- you know, each patent, the '793 patent at

1    issue in this case and the '215 patent that's at issue as an

2    invalidity reference as well as an inequitable conduct

3    reference, are very similar.  No, it's not exact.  There's a

4    different active ingredient.  It lists using the same

5    polymers.  It lists using similar, but different -- similar,

6    but slightly different test parameters for use for how you

7    determine whether it has these dissolution profiles, and it

8    is a platform where they have substituted different drugs to

9    get extended release profiles.  And that's what we're

10   looking at, is, it's not that wide-ranging, because we're

11   really interested in just those three drugs, one of which

12   they say we probably don't even have anything, so that's

13   certainly not burdensome, amitriptyline.  Okay.  So as far

14   as burden is concerned, that's not an issue.

15            In terms of methylphenidate, that's a product --

16   that's a prior art reference for which we know that they

17   have secret testing, which will enlighten, will show what

18   the inherent characteristics of that prior art dosage form

19   would be.

20            And it's the same exact thing as the Schering

21   case, your Honor.  It's the same principle, because --

22            THE COURT:  Well, it's not really the same

23   principle.

24            MR. PACELLA:  If I could explain, sure, the

25   Schering case had to do with metabolite, but what it was

1   was, it was a prior art reference, that document, that said,

2   administer drug X.  And that's all it -- for purposes of the

3   issue in the case, that is what it disclosed.  The secret

4   testing disclosed that when you administer drug X, you get,

5   as a metabolite, drug Y.

6         And so the fact of that teaching of, okay,

7   administering this drug and you get the inherent result of

8   metabolite is the same, your Honor, as here, where the claim

9   says, do a formulation that has components A, B and C --

10  that's the structure -- and wherein that structure provides

11  a dissolution rate in a medium of X percent, Y percent.

12        So they are teaching -- that dissolution

13  parameter that's in that drug in various forms is an

14  inherent feature that they know and it's in their

15  documents.

16        THE COURT:  Right.  But I mean, what they did

17  in Schering, unless I'm missing something, is, the question

18  in Schering was whether a public document inherently

19  disclosed a limitation.  What you're saying is, apparently,

20  that your public document does not inherently disclose

21  anything.  You want to go back into the secret testing and

22  all the lab notebooks an everything else.  That's a very

23  different proposition to me.

24        MR. PACELLA:  It's not though, your Honor,

25  because the only -- everything that's inherent is, by

1  definition, not expressly disclosed.  So we know that that

2  formulation says, you can pick from these ingredients.

3  Here's how you put it together.  And the inherent result of

4  putting those things together and the way that's taught in

5  that patent is something that is inherent to that dosage and

6  it can be shown by testing.

7          THE COURT:  Well, to me, inherent means a

8  person of ordinary skill in the art could practice -- a

9  person of ordinary skill in the art would understand this.

10 I don't think I've ever seen inherency proved by secret

11 testing.

12         MR. PACELLA:  That's what the Schering case is,

13 your Honor.

14         THE COURT:  Where is that?

15         MR. PACELLA:  Well --

16         THE COURT:  I mean, I certainly didn't get

17 that from reading this.  If you want to point out in this

18 where it had to do with discovery of secret testing, I

19 would be very happy to review my decision again.  But I mean

20 I've got it in front of me.

21         MR. PACELLA:  The Schering case?

22         THE COURT:  Well, all right.  Wait a minute.

23 Whether Schering's secret tests before the critical date

24 placed DCL in the public domain.  Did not exist in the

25 public domain such that DCL could be prior art.

1          But the bottom line is, is that another patent

2    suffices as an anticipatory prior art reference because it

3    disclosed this in inherency.

4          So, yes, you're right, it was about secret

5    testing, but it wasn't about going back and grabbing the

6    secret test.  It was about characterizing this other public

7    patent as sufficing --

8          MR. PACELLA:  Well, your Honor, I would have to

9    look back at the -- if you look at those two paragraphs, the

10   paragraph you read and then the one after that, what the

11   second paragraph was saying is that the actual

12   administration of Loratadine -- okay.  All that the prior

13   art patent that was the invalidating patent disclosed is

14   what's shown there in the -- it's the '233 patent, in the

15   very last sentence of head note 7.

16         The '233 patent suffices as an anticipatory

17   prior art reference if it discloses an enabling matter

18   the admission of Loratadine dean to patients.  And

19   that's all it did.  The clinical trials that were done

20   that showed what happened when you administered it to

21   patients were secret, and that's what was the anticipating

22   prior art.

23         THE COURT:  No, no.  I disagree with you.  All

24   they said -- I mean, I don't know, and I don't recall from

25   reading this -- all they said was -- the only holding here,

1    and I think this is the danger of whenever a judge says

2    anything, is that it can be taken out of context and used

3    inappropriately.

4              I believe all the Federal Circuit held in

5    this case was that the secret testing could not be used as

6    prior -- well, is that the secret test -- I have no idea

7    whether it was --

8              MR. PACELLA:  Your Honor, the whole question

9    was whether DCL, which is the metabolite of Loratadine, was

10   in the prior art, and it was not in the published prior art,

11   because the published prior art only showed the

12   administration of the drug --

13             THE COURT:  And all the Federal Circuit held

14   was, it didn't have to be explicitly in the published prior

15   art, that it was inherently known to a person of ordinary

16   skill by looking at the '233 patent, which was published

17   prior art.

18             MR. PACELLA:  I respectfully disagree, your

19   Honor, because the whole issue was that the '233 published

20   prior art was all you were looking at, and the inherency was

21   only derived by this other information.

22             The inherent concept -- if I could perhaps cite

23   another case, which is --

24             THE COURT:  Well, I don't think this case

25   stands for the broad proposition that you have that you are

1     trying to tell me.

2              First of all, I don't even know -- I don't even

3     know that this case is about inherency.  If you are trying

4     to use this case for the proposition that secret -- that

5     confidential tests on non-related patents somehow become

6     relevant because of this case, I don't agree that it stands

7     for that broad proposition.  I really don't see it.

8              MR. PACELLA:  Your Honor, the proposition is

9     not -- I'm trying to find another --

10             THE COURT:  All right.  I mean, clearly, we have

11    the '215 patent that is of issue in the case because of the

12    inequitable conduct.

13             MR. PACELLA:  And invalidity, your Honor.

14             THE COURT:  And invalidity.

15             Now, so the question is whether anything other

16    than -- whether somehow or other your claims related to the

17    '215 patent justify your going behind the patent to the

18    testing and development, which I think is what you want to

19    do.  And, to me, that might be a question that I would be

20    interested in.  As far as going to get the kind of

21    information you want on these other two drugs, I am not

22    convinced that at least this case is helpful to you in the

23    way you want it to be.

24             Is there another case you want --

25             MR. PACELLA:  Well, there's certainly a case, in

1    re Grasselli, which is -- Grasselli, I'm sorry.  713 F. 2d,

2    731, which is a Federal Circuit case, and it stands for two

3    propositions.  One is that it establishes that inherency is

4    equally applicable to 103 as it is to 102.

5           An another one is on the same principle, In re:

6    Napier, which is 55 F. 3d, 610.

7           And, for instance, in Grasselli --

8           THE COURT:  I guess you need to tell me, what is

9    it that's inherent here?

10          MR. PACELLA:  Okay.  So this is a patent claim

11   that involves not just a composition that consists of A, B

12   and C.  You know, a core, a layer, another layer.  It's that

13   and then, in addition to that, it says, wherein, this

14   formulation, when tested in a certain way, results in X,

15   which is a characteristic of that prior art formulation.

16   The formulation that's taught and claimed in that patent

17   as broadly and enabling as that patent teaches it, is a

18   thing.

19          And the '793 patent says that the composition

20   that's claimed is a thing that has a certain characteristic.

21   And what we're looking at is that we know that the

22   characteristic -- the dissolution characteristics of the

23   '215, just to limit to it that, are similar, very similar

24   to the release characteristics of the '793 patent, but they

25   may have been tested in a little different way.  In water

1    instead of acid, or some other thing.

2         And the plaintiffs are saying this is an

3    irrelevant reference because it does not teach that, you

4    know, when you test it according to whatever it's claimed in

5    the '793 patent, you get a result.  That's not in there

6    because it uses some other test method, some other, you

7    know, whatever.

8         And the testing that they were doing that led

9    to that patent is an inherent characteristic of the

10   formulations that are taught in that patent, and so we want

11   to be able to rebut their claims that this is not relevant

12   because it has a different test parameter, or this or that,

13   or because it does not expressly say when you test it using

14   this particular parameter, you get result X.

15        But they have testing that will show the

16   different parameters that it was tested under, the different

17   formulations that were done for that purpose, and it's not

18   in the reference.

19        THE COURT:  So do I understand you correctly,

20   are you saying that the claimed characteristics -- it is

21   possible that the claimed characteristics are a result of

22   the test parameters that are imposed, and therefore -- maybe

23   I misunderstood what you just said.

24        MR. PACELLA:  Well, the bottom line is that the

25   test -- the characteristic that's claimed in the '793 patent

1    absolutely is a result, an inherent result of when you use a

2    test method and you have that formulation, it's a

3    characteristic that can only be done by testing.  And if you

4    don't have a reference that says, you know, when tested

5    using parameter X, Y, Z, you get a result of three.

6              But we have the thing that says, here is the

7    composition.  You don't know what that -- that composition

8    is in the prior art, no doubt.  It's disclosed in the

9    written publication, but we don't have access to the data

10   that shows what those characteristics were, which is an

11   inherent characteristic of when you test it, according to

12   how they tested when it.

13             Does that help at all?

14             THE COURT:  I think it does.

15             MR. PACELLA:  And, again, your Honor, we're not

16   really look looking for that much.  I've heard a lot about

17   burden.  And it really is not -- first of all, with

18   amitriptyline, they said they don't have much, if anything.

19   So that can't be burdensome.  We would be happy with

20   methylphenidate.

21             THE COURT:  I was going to say, I wouldn't push

22   your luck.  If you get anything, it will be the materials

23   related to the patent that's already at issue in this case,

24   assuming I'm understanding this correctly and there is some

25   relevance to -- if I understand the relevance that you are

1    talking about now.

2              MR. PACELLA:  The inherency is one relevance.

3    What the inventors knew and didn't disclose to the Patent

4    Office about that, which, again, is somewhat related to

5    inherency, but it goes to both validity and inequitable

6    conduct.  So there are two bases of relevance for that

7    information.

8              And also, again, your Honor just to take one

9    more shot at it, the reason why we want to know the

10   formulation, again, just documents sufficient to identify,

11   not further discovery about every document related to these

12   things.  But we know the plaintiffs are going to get in and

13   say, you know, we -- this patent is not obvious because

14   there was this long-felt need and this was a difficult thing

15   to do, and we know that they have this Diffucaps platform

16   for many years.

17             We know they were plugging different drugs into

18   it, and we just want to know -- we want to be able to rebut

19   their evidence that we know tat they've already said they'll

20   come out with about the difficulty that other people

21   couldn't do this to show that it was an obvious extension of

22   what they were already doing.

23             THE COURT:  Well, my response to that is, let's

24   wait to see what -- I mean, I take it you've issued

25   contention interrogatories about the secondary

1    considerations of obviousness they intend to put forward.

2              MR. PACELLA:  And they're very -- I'm sorry,

3    your Honor.  I didn't mean to interrupt.

4              THE COURT:  No.  I was just going to say that

5    rather than allow this broad-based discovery right now, it

6    could be that we require the plaintiff to come forward,

7    plaintiffs to come forward with more specific contentions so

8    that we can tailor your discovery requests to what's

9    actually happening in the case as opposed to what you

10   anticipate happening in the case, because it is broad-based,

11   and it is about formulations and drugs that are not

12   specifically at issue here.  And that's rather unusual in

13   my cases, for me to allow that kind of broad-based

14   discovery.

15             MR. PACELLA:  Well, as I said, your Honor, I

16   think the broad-based -- again, I get a little bit

17   concerned because we already had to try to force secondary

18   considerations contentions through the last conference, and

19   what we got was a couple more sentences that were, you know,

20   look at the NDA and whatever.  So we're a little bit worried

21   about going down that path and being ambushed.

22             But I think leaving it off here -- I mean, the

23   most important thing to us for the present purposes is the

24   methylphenidate formulation documents, the specific set of

25   documents, and the documents related to the inequitable

1    conduct of what the inventors, the two named inventors knew

2    about the three specific formulations, and that's not a very

3    broad request in the scheme of things.

4              THE COURT:  All right.

5              MR. PACELLA:  They produced 680,000 pages or so

6    to us, your Honor.  I could live without a lot of them.

7    We're really trying to focus on what we think we need.

8              THE COURT:  Well, unfortunately, in all of these

9    cases, you end up with more documents than anyone can

10   possibly use.

11             MR. PACELLA:  Understood, your Honor.

12             THE COURT:  All right.  Thank you.

13             MR. PACELLA:  Thank you.

14             THE COURT:  Let me hear from counsel for

15   plaintiffs.

16             MR. GARRETSON:  Thank you, your Honor.  I will

17   try to be brief.

18             Focusing on methylphenidate for a moment, I'm

19   reading from Paragraph 83 of Mylan's amended answer and

20   counterclaim on inequitable conduct, which they filed on

21   September 30th.  "Because the '215 patent discloses the

22   precise extended-release technology and dissolution profile

23   that is claimed as novel in the '793 patent, a reasonable

24   examiner would have found the '215 patent to be material to

25   the patentability of the claims of the '793 patent."

1          They are saying it's there in the patent, right

2    there.  It either is or it isn't.  Now we're hearing that

3    there's inherency, and we have to go behind that and we have

4    to dig up documents to test that issue, possibility of

5    different parameters.

6          We don't believe it's relevant to the claim that

7    has been made on a public patent.  They say it's material or

8    it's not.  They talk about parameters that they know about.

9    I'm puzzled as to the source of their knowledge.  They have

10   indicated that there's certain testing that could be done.

11   I respectfully submit to your Honor that that is a matter

12   for expert discovery, and I'm sure that their experts will

13   do tests and our experts will do tests in response.

14         They bear the burden of proof on this issue,

15   and I respectfully submit to your Honor that they have not

16   met the burden of proof for going into these other drugs and

17   other Diffucaps stuff and opening up discovery on that

18   front.

19         And we agree with your Honor's reading of the

20   Schering case.  I would just say with respect to secondary

21   considerations, that Mr. Pacella still has not cited any

22   case that says that what allegations are made or not made

23   with respect to secondary considerations should drive

24   discovery with respect to validity issues and prior art that

25   contravenes the Federal Circuit cases cited in our letter

1    brief, the Life Technologies case and the other case that we

2    cited.

3              So we did provide a substantive response to the

4    contention interrogatory.  It was not just one or two

5    sentences.  We identified the specific bases, some of the

6    specific bases that we would be relying on.  I believe that

7    Mylan even attached that to their brief.

8              There is no basis at this point based on

9    secondary considerations to enter into a kind of further

10   wide-ranging discovery on all of these drugs.

11             And with that, your Honor, unless you have any

12   further questions...

13             THE COURT:  Well, I unfortunately, did not bring

14   out a copy of the patent and read it.  I just would like you

15   to at least opine, and I might have to go back and read the

16   patent before I issue a ruling on this discovery dispute.

17   We had a discussion, and it could be that I misunderstand

18   the patent.

19             But if the characteristics -- if the claimed

20   characteristics, to some extent, depend on how the

21   formulation or the drug is tested, then I guess the question

22   is whether, if that's true in the first instance, whether

23   that's relevant in terms of the materiality, for instance,

24   of the '215 patent.

25             MR. GARRETSON:  I think that's, frankly, your

1    Honor, a subject for expert discovery.  The patent claims do

2    list a particular release profile when tested with a

3    particular apparatus.  The '215 patent that has been

4    asserted by defendants talk about using a different testing

5    apparatus.  And whether or not one of ordinary skill in the

6    art would understand from that disclosure or know from that

7    disclosure that if you used testing apparatus A, or testing

8    apparatus B, it does not make a difference, that's a subject

9    for expert testimony, your Honor, as to what somebody would

10   understand from reading that patent and that testing

11   disclosure.

12           THE COURT:  So you're saying that there

13   shouldn't be any fact discovery about that even though it

14   might be an appropriate issue for experts to -- upon which

15   to opine?

16           MR. GARRETSON:  The testing that has been done

17   with respect to the cyclobenzaprine formulations that are

18   the subject of the patent, that entire development history

19   has been produced, including stuff relating to Diffucaps

20   insofar as it's relevant, to cyclobenzaprine, and the

21   testing that has been done on the various cyclobenzaprine

22   formulations.

23           I don't think that going beyond that into the

24   methylphenidate area or any testing that may or may not

25   have been done -- I, frankly, don't know the answer to that,

1    your Honor, whether the testing has been done or not -- that

2    seems to me, again, to be an issue for expert discovery,

3    not fact discovery, because it does not end there.  It then

4    becomes -- you go beyond the scope of what's actually in the

5    patent, and we go step to step to step, and we end up in a

6    place where we never intended to be at the beginning in

7    terms of scope of discovery.

8            THE COURT:  All right.  I need to give this a

9    little more thought.

10           Thank you.

11           MR. GARRETSON:  Thank you, your Honor.

12           So I stepped away, but I'm back.

13           THE COURT:  Yes.

14           MR. GARRETSON:  A second issue.

15           THE COURT:  I did remember, there was a second

16   issue.

17           MR. GARRETSON:  The second issue, your Honor, I

18   hope we can deal with in a little bit less time than we just

19   spent.

20           At the last conference we had with your Honor on

21   September 15th, we raised the issue of obtaining discovery

22   from Impax.  There were several items that we were seeking.

23   One was FDA correspondence.  Another was electronic

24   discovery relating to categories that Impax had already said

25   it would produce.

1          Your Honor at that time gave Impax one week to

2     put in a letter brief.  They had been at that time resisting

3     producing the FDA correspondence and other materials.

4          When that week came, they wrote a letter to your

5     Honor saying, well, in the spirit of compromise, we're going

6     to produce the materials.

7          We have not received the materials yet.  We

8     received a letter late last week, after we wrote a letter

9     inquiring when we might expect to get this material, saying

10    that they would make a limited production on October 19th of

11    the FDA correspondence, and more than a month after the last

12    conference, and some other lab notebook development

13    documents that may exist.

14         With respect to electronic discovery, they

15    suggested that they should not have to engage in production

16    of any electronically stored material until after the

17    mediation that is currently scheduled before Judge Thynge

18    with Impax on, I believe it's November 18th.

19              MS. MATTERER:  That's correct.

20              MR. GARRETSON:  And suggested that it would

21    thereafter -- if the mediation was unsuccessful, it might

22    take them 30 to 45 days to come up with that electronic

23    information and they could begin producing it on

24    December 19th, right before Christmas.

25              The close of fact discovery in this case is

1        January 15th, for all defendants and plaintiffs.

2                    Yesterday, I had a teleconference with Ms.

3        Matterer, who is here, and Mr. Kent, counsel for Impax,

4        who is not.  And they raised the suggestion of postponing

5        the fact discovery cutoff past January 15th just with

6        respect to Impax, not with respect to discovery taken of

7        plaintiffs, but with respect to discovery taken of Impax, so

8        that they said they would not need to go to the time and

9        expense of producing electronic materials in this case until

10       after the mediation.

11                   The schedule in this case is that -- the next

12       date after the January 15th date for fact discovery is

13       March 5th for initial expert reports.

14                   We are not amenable to that proposal and would

15       like to explain why very, very briefly.

16                   Since the beginning of this case, we've had

17       very little document production from Impax.  The original

18       date for document discovery in this case was August 14th.

19       As of that date, we still had not received Impax's full ANDA

20       in this case and we received no other documents.

21                   We gave them one extension, until September 4th

22       of this year, with the understanding that additional

23       documents would be produced.  On that date, the rest of the

24       ANDA came, and we were told we would get some materials in

25       advance of the discovery conference with your Honor on

1    September 15th.

2              On, I believe it was September 14th, we received

3    400 pages of material, and then you know the rest of the

4    history with respect to the FDA correspondence and

5    everything else.

6              The suggestion that electronic materials should

7    not be produced until after the mediation to us does not

8    make sense because, at least in our experience, mediations

9    proceed on a separate track from discovery.  If the

10   mediation succeeds, that's great.  Everybody can go home.

11   But the reality is that you don't put discovery in the ice

12   box for two months or three months and hope that maybe the

13   mediation will result in everything going away.

14             And we are very concerned that if, in fact,

15   given the history of document issues in this case with

16   Impax, that if we were to agree to putting off electronic

17   discovery, including some very relevant documents, we

18   understand that the decision to market, to go with an

19   ANDA in this case for Impax, this is all electronic

20   information, related material -- we're concerned that if

21   we put that off to some indeterminate time, starting

22   production December 19th and later, that we're going to

23   end up back in front of your Honor with a problem at the

24   end of discovery because materials weren't produced or

25   things were dragged out.

1          We believe, given the history, that it's

2     time to produce this stuff, and we would ask that it be

3     produced before the mediation because we believe it's

4     relevant to both sides having a clear understanding of

5     their positions going into the mediation with Judge Thynge

6     on November 18th.

7          Therefore, we would respectfully request, your

8     Honor, that Impax be ordered to produce the relevant

9     material sometime maybe the first week or ten days of

10    November.  That would be -- November 10th, I believe,

11    would be four weeks from the day they had represented

12    earlier they could do electric electronic discovery in 30 to

13    45 days, maybe.  Given the history of this case, we would

14    respectfully request that they be directed to produce that

15    material in the short end of that range.

16          THE COURT:  All right.  Thank you.

17          MR. GARRETSON:  Thank you, your Honor.

18          THE COURT:  Ms. Matterer?

19          MS. MATTERER:  Mary Matterer, for Impax.

20          Your Honor, the parties have agreed to the scope

21    of Impax's remaining document production, so I'm pleased to

22    say that that is no longer an issue.

23          The only issue that remains, as I understand it,

24    is the timing of the electronic discovery, and Impax is

25    producing additional paper discovery, and I believe that's

1    to be completed October the 19th.  But as for the

2    e-discovery, the mediation is scheduled for November

3    the 18th, and the scope of the e-discovery that the parties

4    have agreed to requires multiple searches for multiple

5    e-mail custodians and servers.

6              The time to produce the agreed-upon discovery is

7    estimated to be about four to five weeks.  E-discovery, as

8    you know, is very costly, and Impax respectfully submits

9    that its resources would be best spent focusing on the

10   mediation and a possible settlement rather than gathering

11   and reviewing the e-discovery at this time.

12             If we were to produce the e-discovery as

13   plaintiff requests, there is every -- and in the event the

14   mediation is successful, it will have been a waste of

15   resources, and Impax's request is to postpone that until

16   after the mediation, to see if it is necessary.

17             I had not heard -- I believe I heard counsel say

18   today that the documents were needed for the mediation.  I

19   had not heard that prior to today.

20             There's absolutely no prejudice to the plaintiff

21   from proceeding in that.  The openings expert reports aren't

22   due until March the 5th.  The close of fact discovery is

23   January 15th, 2010.

24             THE COURT:  I take it there are no -- well, I

25   guess my problem is this, number one.  Why should Impax

1    be treated differently than all the other defendants?

2                 And, number two, generally, document production

3    in my cases is supposed to be done, although it seems rare

4    these days to be done initially so that depositions can go

5    forward.

6                 Now, are you telling me that there are really

7    literally no depositions that need to be scheduled in

8    connection with Impax?  That these documents will only be

9    used for expert discovery?

10                MS. MATTERER:  I'm not sure.  I can't speak to

11   what the issues -- whether plaintiff will see a need to take

12   a deposition at this point.  But I believe that that is the

13   case.

14                The other -- why Impax at this time, why is

15   Impax's situation different?  Your Honor, it's only because

16   we are on the absolute eve of that mediation that this makes

17   sense.

18                I understand that in the other cases --

19                THE COURT:  But that's only because your client

20   has not managed to produce documents, that we're on the eve

21   of mediation.  I guess the question is, why should I reward

22   Impax for being less than diligent all the way through?

23                And I know Impax is not a stranger to my cases,

24   and so I guess I don't want to reward a party, who is a

25   sophisticated litigant, from -- I don't want to reward that

1   party because they have been recalcitrant.

2             MS. MATTERER:  I understand that, your Honor.

3   My only response to that is that the possibility of a

4   successful mediation is enhanced if the parties -- if

5   Impax's resources are conserved.

6             THE COURT:  Well, I've never heard that before.

7   Generally, the possibility of a mediation is enhanced by

8   sharing information so that the more information, generally,

9   the better off we are.

10            I am not convinced that Impax truly should be

11   treated differently than all the other defendants in this

12   case.  As far as I know, they are at this point.

13            Are we pretty much done with document discovery

14   with respect to all the other defendants except for this

15   outlying discovery that I'm still struggling with?

16            MR. GARRETSON:  Yes, your Honor.

17            THE COURT:  And Impax was sued at the same time

18   as all the other defendants?

19            MR. GARRETSON:  Impax was sued very shortly

20   thereafter.  Mylan and Barr came first and then Impax was

21   sued, I believe a matter of a month or two later, so it has

22   been since February of this year, I believe, that your Honor

23   put out the scheduling order, and the August 14th date was

24   provided for all defendants and plaintiffs to produce

25   documents, and then Impax had the extension until

1    September 4th, in part because of the substitution of

2    counsel, but also because there was an understanding

3    from our standpoint that documents would actually be

4    produced.

5              THE COURT:  All right.  Ms. Matterer, this is

6    not a precedent I want to set, and while your client may

7    have a good argument, if all the defendants take up that

8    argument, which I'm sure they will if I allow it, because

9    that's what lawyers do, then we will never have document

10   production done with a mediation scheduled.  So your client

11   will have to finish its e-discovery by November 10th, which

12   I think is a Monday, if I recall correctly.  Veteran's Day

13   is a Tuesday this year.

14             If there are -- obviously, if there are real

15   issues with respect to this, you can get back in touch with

16   me and we'll have a conversation, but the effort needs to

17   be made, and some progress needs to be made by the 10th.

18   All right?

19             MS. MATTERER:  Thank you, your Honor.

20             THE COURT:  All right.  Is there anything else

21   that I need to address this afternoon?

22             MR. GARRETSON:  From plaintiffs, no, your Honor.

23             THE COURT:  And from defendants?

24             MR. PACELLA:  No, your Honor.

25             THE COURT:  All right.  I will take this issue

1    back.

2            If you have any further thoughts that, upon

3    reflection and in light of the conversation we had today

4    about this issue of Mylan's further discovery requests, try

5    to get those thoughts to me in no more than a two-page

6    letter in the next day or two, so that I can take them into

7    account before I issue anything.  It is possible I will get

8    you all on the phone to ask some more questions, but I will

9    try not to take up more of your time.

10            All right, counsel.  Thank you very much.

11            (Counsel respond, thank you, your Honor.)

12            (Court recessed at 5:30 p.m.)

13                        -   -   -

14

15

16

17

18

19

20

21

22

23

24

25