```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
       EURAND, INC., CEPHALON, INC.,
 4     and ANESTA AG,                        :
                                             :    CIVIL ACTION NO.
 5               Plaintiffs,                 :
                                             :
 6            v.                             :
                                             :
 7     MYLAN PHARMACEUTICALS, INC., MYLAN    :
       INC., and BARR LABORATORIES, INC.,    :
 8                                           :    08-889 (SLR-MPT)
                 Defendants.
 9                              - - -

10                         Wilmington, Delaware
                     Monday, April 12, 2010 at 1:00 p.m.
11                        TELEPHONE CONFERENCE

12                              - - -

13     BEFORE:   HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE

14                              - - -
       APPEARANCES:
15

16               FISH & RICHARDSON, P.C.
                 BY:  WILLIAM J. MARSDEN, JR., ESQ., and
17                    JENNIFER HALL, Ph.D., ESQ.

18                    and

19               FISH & RICHARDSON, P.C.
                 BY:  JOHN D. GARRETSON, ESQ.
20                    (New York, New York)

21                         Counsel for Eurand Inc., Cephalon Inc.,
                           and Anesta AG
22

23

24
                                   Brian P. Gaffigan
25                                 Registered Merit Reporter
```

1   APPEARANCES:   (Continued)

2

3                COOLEY GODWARD KRONISH, LLP
                 BY:   TRYN T. STIMART, ESQ.
                       (Washington, District of Columbia)
4

                        and
5

6                COOLEY GODWARD KRONISH, LLP
                 BY:   RICHARD S. SANDERS, ESQ.
                       (Boston, Massachusetts)
7

                        Counsel for Eurand Inc.
8

9                POTTER ANDERSON & CORROON, LLP
                 BY:   DAVID E. MOORE, ESQ.
10

                        and
11

12               WILEY REIN, LLP
                 BY:   MARK A. PACELLA, ESQ., and
                       ROBERT J. SCHEFFEL, ESQ.
13                     (Washington, District of Columbia)

14                      Counsel for Mylan Pharmaceuticals, Inc.,
                        and Mylan Inc.
15

16               PHILLIPS GOLDMAN & SPENCE
                 BY:   JOHN C. PHILLIPS, JR., ESQ.
17

                        and
18

                 WINSTON & STRAWN, LLP
19               BY:   JULIA MANO JOHNSON, ESQ., and
                       MAUREEN RURKA, ESQ.
20                     (Chicago, Illinois)

21                      Counsel for Barr Laboratories, Inc.

22

23

24

25

```
 1                          - oOo -

 2                   P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following telephone

 4    conference was held in chambers, beginning at 1:00 p.m.)

 5              THE COURT:  Good afternoon.  This is Judge

 6    Thynge.

 7              (The attorneys respond, "Good afternoon, Your

 8    Honor.")

 9              THE COURT:  Let's get down who is here on

10    behalf of each of the parties.  My understanding is this is

11    a discovery dispute in the 08-889 case involving Eurand and

12    Mylan.  So who is here on behalf of Eurand?

13              MR. MARSDEN:  Good afternoon, Your Honor.  This

14    is William Marsden from Fish & Richardson.  I have with me

15    here Jennifer Hall and on the phone John Garretson, and

16    that's on behalf of all of the plaintiffs.  Also on the

17    phone on behalf of Eurand is Tryn Stimart from the Cooley

18    Godward firm.

19              THE COURT:  I'm sorry.  I didn't get that name.

20    Could you repeat it?

21              MR. MARSDEN:  Yes, Tryn Stimart.  S-t-i-m-a-r-t.

22    I hope I spelled it right.

23              MR. STIMART:  That's right.

24              MR. MARSDEN:  From Cooley Godward.

25              THE COURT:  All right.  And who is on the line
```

1    on behalf of Mylan, please?

2            MR. MOORE:  Good afternoon, Your Honor.  It's

3    David Moore at Potter Anderson.  And with me on the phone

4    are Mark Pacella and Rob Scheffel from Wiley Rein.

5            THE COURT:  And Rob?  I'm sorry.

6            MR. MOORE:  Scheffel.  S-c-h-e-f-f-e-l.

7            THE COURT:  All right.  My understanding is that

8    the dispute that exists between the parties --

9            MR. PHILLIPS:  Your Honor?

10           THE COURT:  Yes?  I'm sorry.

11           MR. PHILLIPS:  This is Jack Phillips.  I hate to

12   interrupt but Barr Laboratories is on the phone.

13           THE COURT:  Is there any reason why you are on

14   the line, Jack?  Did we do this again where we sent out a

15   notice and we didn't indicate it was just Mylan and Eurand?

16   I apologize if we did, because my understanding is that

17   this is a discovery dispute that exists just between these

18   two parties and does not involve Barr, unless you tell me

19   differently.  I certainly didn't receive something from

20   Barr, and I apologize if I made everybody change their

21   schedule and show up for a teleconference that you didn't

22   need to be involved in.

23           MS. RURKA:  Your Honor, this is Maureen Rurka

24   from Winston & Strawn on behalf of Barr.  We were joining

25   the privilege dispute between the parties.  I think it

1    should have been in the letter that we submitted.

2              MR. PHILLIPS:  Your Honor, the letter from

3    Mr. Moore dated April 8th, 2010 begins, defendants Barr

4    Laboratories, Mylan Inc., Mylan Pharmaceuticals,

5    collectively defendants, respectfully request the Court's

6    assistance.

7              THE COURT:  I apologize.  Yes, you are right.

8              MR. PHILLIPS:  For the record, Your Honor, the

9    letter is from Rich.  It's signed by Rich.

10             THE COURT:  Oh, I recognize it was signed by

11   Rich.  I understood that.  I understood that.

12             MR. PHILLIPS:  Now, Your Honor, just so you have

13   all the players, this is Jack Phillips on behalf of Barr.

14   With me on the phone is Maureen Rurka, R-u-r-k-a, and Julia

15   Johnson from Winston & Strawn in Chicago.

16             THE COURT:  All right.  So everybody is going

17   to be involved in this particular phone call.  And you're

18   right, the first paragraph did provide that.  And maybe

19   because I saw it was signed by Rich, I just flipped over

20   to Mylan.  All right.  I think we have got all the cast of

21   characters down concerning this.

22             First of all, I want to explain to the parties

23   my concern about what may have been not completely accurate

24   analysis on my part on the Bosch v Pylon case.  I went back

25   and re-read the Teleglobe Communications matter, and

1   Teleglobe did deal with an application of a Delaware law

2   privilege under Section 503(b)(3) which was cited by Mylan

3   in their submission.

4           I do note that when I did the Bosch v Pylon

5   case, a review of that, I just quite frankly do not have the

6   time to sit there and check every matter that is cited by

7   the parties but I think this was cited by both of them.  So

8   I'm not 100 percent certain what the law is in the Third

9   Circuit necessarily on this issue, and the issue being a

10  very finite one I think under the community of interest or

11  common interest privilege, and that is whether or not the

12  situation requires that not only must the legal interest be

13  demonstrably common but also whether it has to be shared

14  with the attorney member of the community of interest before

15  the common community of interest or common interest

16  privilege applies.

17          Certainly, there were other cases that were

18  cited, predominantly from Connecticut and New York, but also

19  other cases that were cited by Eurand that clearly didn't

20  hinge on that requirement necessarily, although there was

21  some interesting comments in the IBJ Whitehall Bank & Trust

22  Co. case.

23          Of interesting note is most of these decisions

24  that everybody cited were done by Magistrate Judges or

25  Special Masters, not that that necessarily means anything

1    but shows that we're getting stuck with discovery stuff.

2              So I'm not 100 percent certain that Teleglobe

3    is necessarily on point for this particular case when the

4    entire discussion in Teleglobe concerning the community of

5    interest, which, by the way, the Court found wasn't relevant

6    to the decision that Judge Robinson had previously made in

7    the Teleglobe case, because it related back to a specific

8    Delaware privilege law, specifically 503(b)(3).  So I just

9    want to tell you starting off that's my concern.

10             So does anybody know of any other case in the

11   Third Circuit that is directly on point on that issue that

12   doesn't involve the discussion of, or an analysis of

13   Delaware privilege law in this regard versus an analysis

14   being done by the Third Circuit on the community of interest

15   or common interest privilege but doesn't dovetail into a

16   specific state privilege law?

17             MS. JOHNSON:  Your Honor, this is Julia Johnson.

18             I would direct your attention to one of Judge

19   Farnan's cases from 2003, Constar International.

20             THE COURT:  Oh, I read the Constar International

21   case.  I didn't find it directly on point in this matter for

22   this reason; and the reason being is that it never addressed

23   the issue of exchange of documents between two companies

24   with or without counsel involved under alleged common

25   interest for the seeking or obtaining of legal advice.

```
 1              Constar was limited to a circumstance where
 2    Constar was claiming that all withheld documents were
 3    privileged because the communications occurred between
 4    Constar's former counsel and PLM's former counsel, but the
 5    Court never directly addressed the issue of whether to
 6    have the common community of interest or common interest
 7    privilege apply that you have to have counsel involved in
 8    the exchange of the information directly.
 9              What the Court did recognize, that it creates
10    an exception to the general privilege rule, that once the
11    communication is made, a communication made to an attorney
12    in the presence of a third party will vitiate the privilege.
13    And, remember, this is just an exception to that rule.  It
14    doesn't establish a privilege.  But it also recognized -- it
15    just went through certain points.  It didn't specifically
16    address this finite issue.  It wasn't asked to, because it
17    wasn't an issue in the case, in the analysis.
18              One thing it did recognize, though; and I
19    thought it was interesting that it was cited by Mylan; was
20    the fact that a community of legal interest may arise
21    between the parties jointly developing patents, and that
22    they have a common legal interest in developing patents to
23    obtain the greatest protection and exploring patents, which
24    I think was a quote from the Baxter Travenol Labs case,
25    which he cited.
```

1              But, again, that doesn't address the issue, nor

2    does that case address the issue of do we need an attorney

3    somewhere involved in the process of the exchange?  Directly

4    involved.

5              MS. JOHNSON:  Yes, Your Honor.  While that

6    specific issue wasn't decided in that case, I do believe

7    that there was language in the case that is helpful to our

8    position.  Specifically, Judge Farnan said, Communications

9    made by a party or the party's lawyer to an attorney

10   representing another in a matter of common interest are also

11   privileged.

12             THE COURT:  But the operative word in there is

13   "also."  It didn't say it's only limited to that, it says

14   "are also."

15             MS. JOHNSON:  And the preceding sentence was,

16   Under the Common Interest Doctrine, communications made when

17   multiple clients consult an attorney on matters of common

18   interest are still privileged against third party.

19             THE COURT:  And it says when you do the

20   consultation with an attorney, they are privileged as

21   against third parties.  It does not address the issue of my

22   blanket statement that I put in the Bosch case that you have

23   to have an attorney directly involved in every exchange of

24   information, and that you don't have the protection if the

25   common interest -- whether the exception applies.

1      In a certain circumstance where there is this

2  common interest concern, that is, as I pointed out before,

3  as I mentioned previously, and that is it has to be

4  demonstrably common or the clients have a substantial risk

5  of shared exposure to justify the risk of sharing.  That

6  once that occurs and you do have attorneys involved, can the

7  relaying of information, if it's meant to seek legal advice

8  or exchange or share legal advice, do you have to have the

9  attorneys doing it to the clients or can the clients do it

10  between themselves after they received the information from

11  the attorneys?  That's the issue I think that is going on in

12  this case.

13      MS. JOHNSON:  Yes.  Yes, Your Honor.  That is

14  the issue.  We do have cases from the Third Circuit,

15  including Your Honor's Bosch case as well as Constar, and a

16  case from the District of New Jersey, Cooper Health Systems

17  v Virtua Health.

18      THE COURT:  And Cooper Health Systems I didn't

19  necessarily find applicable this case either, the

20  circumstances.  You can sit there and pick out, just like

21  everybody else does in all these cases, language that you

22  say supports our position.  But if it doesn't deal with

23  the issue addressed, it doesn't support the position

24  necessarily.  That's what I'm getting to.  And, yes, I put

25  it in the Bosch case; but going back and looking at the

```
 1    Bosch opinion and going back and looking at the Teleglobe
 2    case, I looked over the section in Teleglobe, specifically,
 3    footnote, what was it, 21 in that case that made it clear
 4    that the Court was just looking at this from the standpoint
 5    of the fact that they were applying Delaware law, and,
 6    specifically, Delaware Rule of Evidence 503 -- I can't
 7    remember what it was -- (b) I think it was or something like
 8    that.  503(b)(3).  So I may be incorrect.
 9            My question is what else is in the Third
10    Circuit?  And the cases I have already gotten in your
11    submissions are not directly on point on this issue.  I
12    don't think necessarily plaintiff has answered it either.
13            MS. JOHNSON:  Yes, Your Honor.  We provided to
14    you the most on point cases we could find in the Third
15    Circuit.
16            I would just add that I think the rationale that
17    the Third Circuit provided in Teleglobe for limiting the
18    privilege to communications between attorneys is still
19    applicable regardless of whether it applies to a specific
20    Delaware Rule of Evidence or to more of a federal common law
21    privilege.  And I do say I am not aware of any cases that
22    the plaintiffs have cited in the Third Circuit or this
23    District where the Court has specifically found that there
24    is no requirement that attorneys be involved in the
25    communication.
```

1          MR. GARRETSON:  Your Honor, it's John Garretson

2     for plaintiffs.

3          I think the departure point is the distinction

4     between a state law privilege question and a federal common

5     law question.

6          THE COURT:  Well, I don't even know whether

7     there is necessarily federal common law, if it rises to that

8     point of federal common law, to be honest with you, John.

9     I'm not 100 percent certain of that.  I know how the cases

10    that you cited to me from Illinois and Connecticut and New

11    York apply, but I don't know whether it's "the level of

12    federal common law" or not, because there is not even

13    consistency among those cases that say.  But go ahead.

14         MR. GARRETSON:  No.  What I was going to say is

15    to the extent there are cases going the other way, they tend

16    to, like Your Honor pointed out with respect to Teleglobe,

17    they rely on a specific state law question.

18         THE COURT:  Well, the only one that has been

19    cited that relies on a specific state law question was the

20    Teleglobe case.

21         However, there was also the case that you guys

22    cited, I think.  It was actually the IBJ Whitehall matter,

23    which dealt with the state law claim of negligent

24    misrepresentation by an insurance broker.  It dealt with a

25    state law action, unlike some of the other cases that were

1    cited that dealt with both combination federal law action,

2    like under the Lanham Act, and then a companion state law

3    claim that was similar to the Lanham Act position.

4            But in the IBJ Whitehall matter, it was

5    determined in the Northern District of Illinois by this

6    Magistrate Judge that -- and that was a mixture in her

7    opinion I think, too, between the joint defense doctrine and

8    the common interest doctrine, which the Third Circuit did

9    distinguish in the Teleglobe case.  But what they did

10   say, when she did her analysis of documents which in part

11   referenced legal advice, because she categorized, in that

12   IBJ case, three categories of it -- one that were ordinary

13   business communications which she found were not privileged,

14   documents which in part reference legal advice.

15           What she held was, Communications between two

16   parties having a common interest in litigation may be

17   privileged if:

18           one party is seeking confidential information

19   for the other on behalf of an attorney;

20           two, one is relaying confidential information to

21   the other on behalf of an attorney; and,

22           three, the parties are communicating work

23   product that is in relation to the litigation.

24           And my understanding is the documents that are

25   the concern in this case, John, I think there are eight or

1   ten of them, whatever the number of them is, all deal with

2   events that I thought predated this litigation.  It dealt

3   with matters concerning a relationship that existed between

4   Eurand and -- I can't remember the other party, the other

5   party at this point.

6                  (Unidentified speaker):  Robins, Your Honor.

7                  THE COURT:  Robins.  Thank you.

8                  MR. GARRETSON:  The IBJ case is interesting for,

9   it illustrates that it is kind of question of law dependent.

10  We wouldn't say that necessarily the three-part test that

11  the IBJ judge laid out relating to the Northern District of

12  Illinois is appropriate here for a state cause of law, but

13  it's just illustrative of the fact that you have to go back

14  to what is the cause of action?  What is the thing that is

15  happening here?

16                  For the license issue, the patents and license

17  issues, departing from the Regents of University of

18  California case and the Baxter Travenol case that we cited

19  in our letter, looking at it as a question of, you know,

20  federal common law, and then Your Honor raised a question is

21  there anything in the Third Circuit?  I don't believe that

22  either defendants or plaintiffs have found a case directly

23  on point that applies to federal common law to address this

24  precise point.

25                  However, I think the Restatement 3rd that we

1   cite as a default, looking at it from a default

2   perspective --

3                   THE COURT:  Section 76?

4                   MR. GARRETSON:  The Restatement 3rd, Comment B.

5                   THE COURT:  Yes.

6                   MR. GARRETSON:  About stating communications

7   directly among clients may be protected under the common

8   interest doctrine.

9                   And also the rights treatise that we mention

10  that states that clients without a common attorney may

11  communicate amongst themselves, and with the separate

12  attorneys on matters of common legal interest.

13                  THE COURT:  But which Restatement section are

14  you talking about?  Is it 76?

15                  MR. GARRETSON:  Comment C, Your Honor.

16                  THE COURT:  Comment B under what Restatement

17  section?

18                  MR. GARRETSON:  Oh, I'm sorry.  The Restatement

19  3rd of the law governing lawyers?

20                  THE COURT:  What section?  The sub-part.  Is it

21  Section 76?

22                  MR. GARRETSON:  Yes, Your Honor.

23                  THE COURT:  Thank you.

24                  MR. GARRETSON:  I apologize.  I understood it

25  the fourth time around.  My apologies, Your Honor.

1          And also the Rice treatise that I was

2    mentioning.

3          THE COURT:  Right.  But Rice was predominantly

4    quoted in Teleglobe, too.

5          MR. GARRETSON:  Yes, but just for the

6    proposition that it is kind of a general default from a

7    federal common law perspective that broadly recognized that

8    the community of interest privilege, the community of

9    interest would apply even in the absence of communication

10   directly with an attorney.

11         THE COURT:  Well, as I pointed out, as I said

12   before, on the IBJ Whitehall case, I don't think that Court

13   even recognized it was a state law claim, applied a federal

14   approach to this, recognized that the Seventh Circuit hadn't

15   talked about this particular issue, and the Seventh Circuit,

16   though, apparently doesn't even look at the International

17   Business Machines case as the adaptation for its standard

18   for attorney-client privilege and, apparently, has a rather

19   narrow approach to the process anyhow because they noted

20   that a Delaware case, Hercules Inc. v Exxon Inc., more

21   broadly extended attorney-client privileges than what has

22   been going on in the Seventh Circuit.

23         MR. SCHEFFEL:  Your Honor, this is Robert

24   Scheffel for Mylan.  If I could chime in real quick on one

25   other issue that I don't want to get lost.

1            THE COURT:  Yes.

2            MR. SCHEFFEL:  Apart from where we think the

3    case law is on this issue, whether it has to directly

4    involve an attorney or whether it can indirectly involve

5    legal advice that is shared, I think there are two questions

6    that you identified there that we have serious concerns

7    about with respect to the identified documents here.  And,

8            One.  It's whether or not the communications

9    between these two business people were on behalf of lawyers

10   and were for the purposes of seeking legal advice as

11   opposed to maybe being commercial communications or other

12   communications that just may have involved patent issues.

13   And we have seen a document that was originally produced

14   that was then pulled back which, in a way, was in part the

15   beginning of this dispute, in which this is why we were

16   requesting at least in camera review with respect to these

17   communications.  Because the communication as it's logged

18   has the, you know, standard magic language about "for the

19   purposes of obtaining legal advice" but there was nothing in

20   that document that suggested that that was the case.

21           There is also an additional.  In addition to

22   the legal positions, there appear to be some factual issues

23   with respect to these limited communications that we would

24   request the Court, at a minimum, take a look at in camera.

25   And we tried to keep it very small and a very short number

1    of documents so that can be done.

2              THE COURT:  They may be short, but my question

3    is how many pages do each of the documents have?

4              MR. SCHEFFEL:  I think that the answer to

5    that is not very many.  I think most of them are e-mail

6    communications.  So I don't think you are going to be

7    looking at 700 pages of documents.  I think it's probably

8    more like 50 pages of documents, max.

9              THE COURT:  I know the word "not very many" is a

10   relative term and when you talk to patent attorneys "not

11   very many" can be amazing.

12             I do have a question for the plaintiff.  And

13   that is, when you mentioned to me the development license

14   and contracting manufacturing agreement, has that been

15   produced to defense counsel?

16             MR. GARRETSON:  Yes, Your Honor.  I believe it

17   has.

18             THE COURT:  Is that the agreement that you are

19   relying upon to indicate a common interest?

20             MR. GARRETSON:  There are I guess two

21   agreements.

22             THE COURT:  Okay.

23             MR. GARRETSON:  That development and licensing

24   contract agreement in 2000.  Then there is also --

25             THE COURT:  The exclusive licensee --

1          MR. GARRETSON:  -- confidentiality agreement

2    that is cited in that agreement.

3          THE COURT:  I'll go back and repeat the

4    question.  Have both of those agreements been provided to

5    defense counsel?

6          MR. GARRETSON:  I believe so, Your Honor.

7          THE COURT:  Have they been provided in redacted

8    form to defense counsel?

9          MR. GARRETSON:  Mr. Scheffel can confirm, but I

10   don't believe that they were redacted.

11         THE COURT:  Are these the two agreements that

12   you are relying upon which says -- which would say to the

13   Court or you would think would say to the Court that, one,

14   we expect confidentiality and that there is something that

15   would indicate a common sharing of legal advice and the

16   purpose for this common sharing of legal advice?

17         MR. GARRETSON:  Yes, Your Honor.

18         THE COURT:  So are there specific paragraphs,

19   limited paragraphs in those agreements that would help the

20   Court to understand yes, you had a common sharing of legal

21   advice and the purpose for which it exists?

22         MR. GARRETSON:  Yes, Your Honor.  And we can

23   provide those, if you would like us to.

24         THE COURT:  Yes, I would.  That was one thing I

25   definitely would want.  And I just want the front page --

1    the pages that tell me that information.  And if the parties

2    need to confer with one another as to what paragraphs I

3    should be reading within those agreements, fine.  But I

4    don't really care to know all the ins and outs of those

5    agreements unless you say to me, listen, judge, we're

6    talking about five pages and it would take no time to read

7    them.  I mean five pages for each agreement.  I have no

8    idea how long these are.  So the parties can get together on

9    what parts of the agreement I should be looking at in that

10   regard.

11            Was there any evidence presented on how the

12   parties to these agreements demonstrated actual cooperation

13   towards a common legal interest?

14            MR. GARRETSON:  Yes, Your Honor.  There was an

15   eventual license.  This is a development and license

16   agreement.  It resulted in a license.  So there is I guess

17   evidence in the agreement itself and in the parties course

18   of dealing, documents that were produced after that as well.

19            THE COURT:  The documents that are under

20   consideration, the documents that the defendants have asked

21   me to review in camera, when was the timing of these

22   documents, that is, the exchange of these documents in

23   relationship as to when the development, license and

24   contract manufacturing agreement occurred versus the

25   exclusive licensing agreement?  Do you understand the

1    question, John?

2              MR. GARRETSON:  Yes, I believe I do, Your Honor.

3    And if I don't, I know you will tell me I didn't understand

4    and to figure it out.

5              The agreement, the development license agreement

6    was dated 2000.

7              THE COURT:  All right.

8              MR. GARRETSON:  I believe most of the, if not

9    all of the documents in question; in other words, a number

10   of years of collaboration; most of the documents in question

11   are dated in 2007.

12             THE COURT:  Okay.

13             MR. MARSDEN:  Your Honor, this is William

14   Marsden.  I believe they were all dated after 2000 and in

15   the 2007 time frame.

16             THE COURT:  And when is the exclusive licensing

17   agreement?  The license that you mentioned, the Claiborne

18   Robins Company Inc. exclusive licensee of technology?  I

19   understand that -- did they have an exclusive licensing

20   agreement with you?

21             MR. GARRETSON:  They do, Your Honor.  And I

22   believe it was the result of that agreement in 2000.

23             THE COURT:  Okay.  But what is the date of the

24   licensing, exclusive licensing agreement?

25             MR. GARRETSON:  July of 2000, I believe, Your

1    Honor.

2                      THE COURT:  So both agreements are executed in

3    2000?

4                      MR. GARRETSON:  It's all one agreement.

5                      THE COURT:  I apologize.  I misunderstood.  I

6    thought it was two.

7                      MR. GARRETSON:  There is a second agreement, but

8    it's an earlier strictly confidentiality agreement that is

9    cited.

10                     THE COURT:  Oh, okay.

11                     MR. GARRETSON:  So there is only one development

12   and license agreement.

13                     THE COURT:  So you have got a strictly

14   confidentiality agreement and then you have this agreement

15   that is development, license and contract manufacturing

16   agreement which incorporates and makes Claiborne Robins your

17   exclusive licensee.  Is that correct?

18                     MR. GARRETSON:  Yes.

19                     THE COURT:  Okay.  And prior to that time of the

20   execution of this agreement in 2000, you believe that a

21   confidentiality agreement existed between these parties,

22   Eurand and E. Claiborne Robins Co.?

23                     MR. GARRETSON:  Yes.  They started by executing

24   a simple confidentiality agreement.  And then in 2000, when

25   the main agreement was signed, they referred back to the

1    1999 confidentiality agreement and also had its own

2    provisions relating to confidentiality, given the 2000

3    agreement.

4              THE COURT:  All right.  Was the original 1999

5    confidentiality agreement supplied to the defense?

6              MR. GARRETSON:  I believe it was, Your Honor.

7              THE COURT:  All right.  And the question that I

8    have for the defense is contained in the second footnote in

9    Eurand's submission about Document 144.  And they argue that

10   the log makes it clear that this is a privileged

11   communication in the form of an attachment to an e-mail,

12   logged as Document 143, which was sent to Eurand's attorney

13   and ECR's attorney, (Grayson) for the purpose of obtaining

14   legal advice regarding AMRIX.

15             MS. JOHNSON:  Yes, Your Honor.  We believe that

16   regardless of whether an attorney was copied on or was a

17   recipient of that communication, that doesn't end the inquiry

18   with respect to whether the common interest privilege

19   applies.  The common interest privilege would apply only if

20   the underlying substance of the communication is privileged.

21             Specifically, some examples that I believe Your

22   Honor gave in Bosch was that the information be shared to

23   coordinate legal strategies or that the communications be

24   part of an ongoing and joint effort to set up a common

25   defense strategy.

1          THE COURT:  It doesn't have to be limited to

2    defense.  As recognized in the Constar case that you cited

3    to me, the parties can have that type of relationship if

4    they're trying to get a patent together, or trying to work

5    on patents.

6          MS. JOHNSON:  Yes, Your Honor.  However, that

7    doesn't necessarily follow that any communications between

8    business people that happen to reference the patent would

9    necessarily be privileged.

10          THE COURT:  But this wasn't a situation of

11    communication between business people.  My understanding is

12    it was Eurand's attorney and ERC's attorney.

13          MS. JOHNSON:  The author of that document I

14    believe was a business person or a scientist at ERC.  The

15    document was sent to a number of people, one of whom is an

16    attorney at Eurand, and then an additional attorney was cc'd

17    on the document.

18          THE COURT:  That is Document No. 143?

19          MS. JOHNSON:  Yes.

20          THE COURT:  And 144?

21          MS. JOHNSON:  Correct.  So, in other words, it

22    wasn't direct attorney-to-attorney communication.

23          THE COURT:  Oh, I see.  I see what your problem is.

24          Well, I'm going back to the fact that I'm not

25    certain my opinion in the Bosch case is necessarily correct

1    in the regard of the requirement that an attorney has to be

2    involved in light of other jurisdictions that recognize it

3    differently, but they do give me -- the cases that have

4    been cited by Eurand do not necessarily mean that Eurand's

5    designation of these documents as being privileged is

6    necessarily covered there because I've got to consider:

7             whether or not they had shared an attorney or

8    attorneys in pursuing a common legal interest;

9             was the confidential information given under

10   circumstances where the third parties had this common legal

11   interest as opposed to a commercial interest, and;

12            did the parties demonstrate actual cooperation

13   towards that common legal interest.

14            So having looked at this, I don't necessarily

15   say the privilege log is inadequate, but it's the timing of

16   when these events that occurred that cause me some concern.

17            So I'm willing to do an in camera review of

18   these documents.

19            Obviously, if some of these documents are string

20   cites of e-mails, unfortunately, I need the whole set, not

21   just the last e-mail in line or the first e-mail in line

22   because it won't necessarily mean that everything in between

23   is privileged because I have to do an analysis of each

24   document, each e-mail independently.  So why don't you

25   produce those for me, John.

1          What I may do is get you guys -- not write you

2     any opinion on this case but just either get you back on the

3     phone or just send you an order saying as a result of what

4     is contained in our discussion today ... and just tell you

5     what to produce and what not to produce, or I may turn

6     around and say everything is part of a common interest

7     approach and common interest privilege.

8          MR. GARRETSON:  Understood, Your Honor.  We'll

9     get the documents together and submit them.

10          THE COURT:  Okay.  When can you get them to me?

11     And is defense counsel's estimate right it's about 50 pages

12     of stuff?

13          MR. GARRETSON:  I think it's definitely

14     ballpark.  It may be less than that.  And we could endeavor

15     to do it -- I would hope we could collect them and provide

16     them by the end of the day.  Certainly, if not the end of

17     the day, first thing tomorrow morning.

18          THE COURT:  We'll, I'm not going to be reading

19     them Tuesday, Wednesday, or Thursday, so if you can get them

20     to me by Thursday, that will be most helpful, along with the

21     provisions of the confidentiality agreement and the parts of

22     the other agreement that both parties feel are pertinent for

23     me to review.  Since defense counsel has had access to them,

24     they should be able to figure that out.  So get that to me

25     by Thursday, both sets.

1          MR. GARRETSON:  Yes, Your Honor.  Will do.

2          THE COURT:  Thank you.

3          Now, the second issue is the striking of Dr. --

4     how do you pronounce his name?

5          MR. STIMART:  It's Dr. Amidon, Your Honor.

6          THE COURT:  And, again, I didn't find the case

7     that you cited from Judge Robinson all that helpful.  I

8     think you did what is typical, and that is to pull out a

9     section of what she is talking about and just quote it as

10    being an extreme approach when the circumstances of that

11    case did not indicate the same type of "relationship" that

12    existed with Dr. Amidon and, if it wasn't Eurand, it was

13    somebody that Eurand was working with.  So I don't

14    necessarily find it particularly on point, although it does

15    give me some understanding of the position.

16         Specifically, since plaintiff is making the

17    statement or plaintiffs are making the statement that

18    Dr. Amidon should be excluded from having access or serving

19    as an expert in this case, what is the information or what

20    is the specific time frame that he actually did any work

21    or had any relationship with -- and I think it was, wasn't

22    it with Medeva?  And what type of allegedly confidential

23    documents were provided to him at that time?  When did the

24    relationship end?  And why was he retained by Medeva and

25    allowed by Eurand to be involved as a consultant?  And, what

1    was the extent of his involvement as a consultant?

2             MR. GARRETSON:  Your Honor, it's John Garretson

3    again.  Mr. Stimart knows some of the facts more directly

4    than I do, so I would defer to him in the first instance but

5    also would have thoughts on that matter as well.

6             THE COURT:  Okay.

7             MR. STIMART:  Good afternoon, Your Honor.

8             THE COURT:  Good afternoon.

9             MR. STIMART:  Dr. Amidon was retained by Medeva

10   Americas back in 1996 to act as a formulation consultant on

11   a project where Eurand was working with Medeva, who is now

12   known as UCB Inc. to develop the Diffucaps platform for

13   methylphenidate hydrochloride, which Your Honor may recall

14   has been the subject of a discovery dispute in this case.

15            Dr. Amidon was identified to Eurand as someone

16   who would be assisting Medeva with the formulation, and,

17   specifically, helping Eurand with questions on formulation.

18   And Medeva retained Dr. Amidon, made that knowledgeable to

19   Eurand, and at all times Eurand and Medeva were under an

20   agreement.  They had multiple agreements back in time,

21   back from the 1995 time point all the way up, including an

22   agreement that still has confidentiality provisions today.

23            Dr. Amidon was provided information not only

24   by Medeva that was given over by Eurand as part of their

25   agreement, because Eurand was developing this methylphenidate

1    product for Medeva and was sharing progress reports and

2    sharing other types of information.  Eurand also sent

3    directly to Dr. Amidon information at the request of Medeva

4    so he could review and comment on formulation and help

5    Eurand with their formulation strategy.

6              And so what he would have seen would have been

7    confidential, actually highly confidential at the time, at

8    least, if not now, Eurand's thoughts on how to develop this,

9    how to work with various types of platforms, how to put the

10   drug on the sugar spheres, if you will.  All the nuances and

11   knitty gritty of the development of a product.

12             THE COURT:  Did he sign a confidentiality

13   agreement?

14             MR. STIMART:  We understand that he did, Your

15   Honor.  During the litigation with UCB, we did not see a

16   copy of that.  That was not produced by Medeva, but we

17   have contemporaneous documents that were produced that

18   demonstrate Dr. Amidon's retention by Medeva, both from

19   Medeva to him and vice-versa.

20             THE COURT:  There was a lawsuit eventually

21   between you and Medeva?

22             MR. STIMART:  There was a lawsuit against Eurand

23   and Medeva regarding -- not a patent issue.  It was a trade

24   secret misappropriation claim and some breach of contract

25   issues, Your Honor.  And that case settled a couple years

1    ago.

2               THE COURT:  And did that have to deal with the

3    Diffucap platform regarding methylphenidate?

4               MR. STIMART:  Yes, Your Honor.  That was the

5    product that Eurand developed for UCB which is currently

6    sold on the market as Metadate CD.

7               THE COURT:  And did this deal with extended

8    release?

9               MR. STIMART:  Yes, it did, Your Honor.

10              THE COURT:  But the trade secret dispute that

11   existed between Eurand and Medeva, that dealt with

12   methylphenidate?

13              MR. STIMART:  Correct, Your Honor.

14              THE COURT:  Okay.

15              All right.  What is Dr. Amidon intended to be?

16   This is a question for the Mylan/Barr side.  What is

17   Dr. Amidon going to be used for in this case?  Is he going

18   to be a testifying expert, or plan to be a testifying expert?

19              MR. SCHEFFEL:  Your Honor, at this point in

20   time, I think the answer there is yes.  That was our

21   intention when we hired Dr. Amidon.  He is a well renowned

22   expert who has consulted on probably thousands of projects.

23   And so currently that was our intention and in particular

24   with respect to the issues of infringement and validity in

25   this case.

```
 1                    THE COURT:  And who just said that?

 2                    MR. SCHEFFEL:  That was Robert Scheffel for

 3       Mylan.  I'm sorry, Your Honor.

 4                    I just want to remind you, counsel, to please

 5       advise who you are before you speak so that the court

 6       reporter knows, most importantly, and me, too.

 7                    Is he planning to be both on infringement and

 8       invalidity?

 9                    MR. SCHEFFEL:  This is Robert Scheffel again.

10       The answer to that currently is yes.

11                    THE COURT:  Why wasn't his prior relationship to

12       Eurand disclosed at the time of his designation?

13                    MR. SCHEFFEL:  Because there was no recollection

14       of having that relationship with Eurand.  We haven't seen

15       any documents, Your Honor.  Dr. Amidon doesn't have any.

16       They haven't produced any to show that he had any

17       confidential -- be in a relationship directly with Eurand.

18       It was more than 15 years ago when this alleged contact and

19       this agreement occurred.  Dr. Amidon doesn't recall

20       virtually anything about it.

21                    So we've been asking all along.  This is kind

22       of one of the darnedest things.  We have a challenge in

23       which the plaintiffs have a burden of establishing that he

24       maintained or received confidential information, and that

25       this information is still confidential, and that it was
```

1    specific information that pertains to this case.  We haven't

2    seen any of those documents.  And then on top of that now,

3    you know, it's almost ironic we have a situation where they

4    have fought so hard to say the methylphenidate has nothing

5    to do with this case and it's irrelevant and now they want

6    to rely on confidential information that was obtained or

7    provided to him 15 years ago that somehow precludes him from

8    testifying even about what is out in the prior art.

9            It's a very difficult situation for us to

10   address other than we've talked to Dr. Amidon and he has no

11   documentation and little recollection as to anything that

12   happened that long ago.

13           The one thing I would add, too, is that the

14   plaintiffs have referred to him generically as, you know, a

15   formulation development type of expert.  Dr. Amidon doesn't

16   recall that as being his role at all.

17           THE COURT:  What was Dr. Amidon's role that he

18   recalls?

19           MR. SCHEFFEL:  His role, as he recalls it, was

20   that he did limited consulting work for Medeva, who is a

21   third party in which they asked him to look at some blood

22   data work with respect to a number of different formulations

23   from people.  It wasn't just Eurand.  And so he doesn't even

24   recall whether he specifically knew what the actual dosage

25   form was and all the different aspects of it.  That is what

1    we hear from Dr. Amidon.

2             Again, this is 15 years ago.  And we're not,

3    you know, in a position where we've had a chance to even see

4    the documents that plaintiffs are now relying upon for, you

5    know -- and we cited the Sygenta Seeds case just to lay out

6    the fact that this is not a -- that this is a tough burden.

7    They have the burden of coming forward with specific

8    documentation to show what was confidential and how it

9    remains confidential.

10            We apologize if we didn't give you enough

11   information on that.  In a three-page letter brief with two

12   issues, we were kind of stretched for space, so I apologize

13   after the fact for that.

14            THE COURT:  Well, the only thing I'm saying is

15   when parties cite cases, it would be nice if both sides

16   didn't make the practice of cherry-picking out what they

17   felt was important as well as whether the case itself is

18   entirely relevant to the issue.

19            My understanding, at least according to Judge

20   Robinson's opinion, though, in that circumstance was the

21   Court has adopted a two-part inquiry to determine whether an

22   expert should be disqualified.  And that is,

23            was it objectively reasonable for the parties

24   seeking disqualification to have concluded a confidential

25   relationship existed with the expert?  And,

1           was confidential or privileged information

2     disclosed to the expert?

3           What I don't have here is a good understanding

4     of the type of information he would have reviewed, although

5     I have a general overview of it.  I also have information

6     indicating the timing of when this occurred.  It is my

7     understanding that was 15 years ago, although I'll go back

8     to you, Rob.  You're saying it was 15 years ago.  When does

9     Dr. Amidon recall that he had this relationship with Medeva?

10          MR. SCHEFFEL:  This is Robert Scheffel again.

11          His recollection was -- and, again, I had a

12    telephone conversation with him.  It was back in the

13    1995-1996 time frame.  And his recollection was that it was

14    a very limited relationship.

15          Now, I'll hearing different allegations, but I

16    haven't seen any documentation from plaintiffs, and I think

17    it's their burden to set forth that.

18          The question also that I don't want to get

19    lost here, Your Honor, is that to the extent that this is

20    confidential information, and if we had a separate witness

21    that came in and this information was requested during

22    discovery and was put forward, that information would still

23    be available to that expert.

24          Now, the question of whether or not it pertains

25    directly to the invalidity issues in terms of the question

1    that plaintiffs have been talking about with respect to?

2    It's irrelevant to the invalidity issues.  You look at the

3    prior art.  You look at those things.  Dr. Amidon should

4    still be able to do that regardless.  And this information,

5    if he received it, it would be kept as confidential.

6          This really isn't the same sort of standard

7    disqualification type of motion here.  And it just seems

8    like it's kind of a square peg/round hole type of objection

9    to us.

10          THE COURT:  Going back to Eurand.  Why can't he

11   testify about what is prior art?  If it's prior art, it's

12   public; right?

13          MR. GARRETSON:  Your Honor, Mr. Stimart may have

14   some additional facts to bring to bear on this; but Mylan

15   has tried several times now with Your Honor to get at

16   confidential Eurand methylphenidate information that they

17   say is relevant, and that we have tried to show is

18   irrelevant, to the issues in this case.  And if he is a

19   testifying expert on methylphenidate issues and they're

20   simultaneously saying, I just heard Mr. Scheffel say that

21   anything that is confidential is irrelevant, that is not the

22   position that Mylan has taken in its previous briefing

23   before Your Honor.

24          Secondly, if this material is produced or

25   provided, then if it puts Mr. Amidon in a position of

1    essentially having at one point represented Eurand through

2    Medeva and then testifying potentially on the basis of

3    material received on the other side of that representation.

4    Whether it happened a certain number of years ago or it

5    happened yesterday, that I'm not sure that the number of

6    years matters.  And I'm curious about how there is a

7    specific recollection of exactly what kind of work was done

8    with Medeva that related to that project but, you know, no

9    other recollection at all.

10             The last point I would offer --

11             THE COURT:  I think what he is saying is that he

12   was relatively unimpressed.  I mean it wasn't something that

13   stuck with him is what I got.  But go ahead.

14             MR. GARRETSON:  We did provide agreements to

15   Mylan before this letter briefing occurred that characterized

16   the confidential relationship.

17             There are other documents -- and Mr. Stimart is

18   in a better position to speak to this.  There are other

19   documents that we told Mylan about.  It's my understanding

20   they are subject to a separate protective order, and we're

21   not at liberty to just turn them over to Mylan and without

22   dealing that issue.

23             And with that, I will turn it over to Mr.

24   Stimart.

25             MR. STIMART:  Your Honor --

1          THE COURT:  Wait.  Before you begin, those other

2     protective documents are dealing with what?  Are you saying

3     they're between Eurand and Medeva?

4          MR. GARRETSON:  Eurand and a successor, cell

5     pack.  The Medeva entities morphed into Celltech, which

6     morphed into UCB over time.

7          THE COURT:  When I refer to Medeva, understand

8     I'm talking what existed then and what exists now.

9     Basically if it's morphed, it's morphed.  But instead of me

10    trying to remember all the sub-parts to this, that is just

11    what I will refer to it as.

12         MR. GARRETSON:  Understood, Your Honor.  It

13    was documents that were produced during the litigation that

14    were Medeva documents over to Eurand that demonstrate the

15    relationship with Dr. Amidon.  And so those were subject to

16    the protective order.  There are several documents, including

17    a document by Dr. Amidon back to various individuals within

18    Medeva on his own letterhead that describe the relationship.

19         And a couple of other additional facts, Your

20    Honor, that I think are important.

21         THE COURT:  What is the date of the --

22         MR. GARRETSON:  It wasn't only documents that

23    Eurand provided.  Dr. Amidon was physically present at

24    Eurand's Vandalia manufacturing plant for a meeting on at

25    least on one occasion where the parties all sat together

1    in a room and discussed Eurand's development.  So his

2    recollection, notwithstanding the fact, is he was present at

3    Eurand and clearly was involved with the project.

4            Another point, Your Honor, is Your Honor might

5    be aware that Judge Farnan recently had the litigation

6    involving UCB Inc. v KB Pharmaceuticals.  And in that case,

7    it involved the '215 patent as we understood it.  Eurand

8    wasn't a party to that at all.  But Dr. Amidon was subpoenaed

9    by KB as a fact witness related to methylphenidate.  And we

10   understand based on the public docket than there was a

11   subpoena issued to him.

12           That case ultimately settled, we understand.  So

13   we don't know if he was deposed.  We don't believe he was

14   deposed.  But it's interesting that Dr. Amidon is claiming

15   he has no recollection of methylphenidate at this point, yet

16   in the past year or so at the most, he was subpoenaed as a

17   fact witness on this exact topic.

18           THE COURT:  But you don't know if he was deposed.

19   You don't know if he testified.  And maybe he was selected

20   or noticed as a witness just because his name showed up on

21   documents.  I have no idea.

22           MR. GARRETSON:  You're right, Your Honor.  We

23   don't have that.  We weren't counsel for UCB, and we don't

24   have access to inside knowledge on that.  But we do know

25   that he was subpoenaed as a fact witness in the case; and,

1     clearly, the subject matter was methylphenidate, and it

2     clearly involved that patent.

3           It is conjecture, but I think it begs the question.

4     Why he would claim he has no recollection or very little

5     recollection at all when, in fact, he just received a subpoena.

6           THE COURT:  All right.  This is the way I look

7     at it for him.

8           I have limited information concerning this

9     gentleman.  I do think both parties have been using

10    methylphenidate as a sword-and-shield situation but more so

11    with the plaintiffs.

12          And I'm assuming this, too, based upon what I

13    heard so far.  Are you representing to me, that is, the

14    defendants are representing to me that Dr. Amidon has no

15    records of anything that he did in relationship to the

16    Diffucaps platform involving methylphenidate, whether he was

17    aware of a relationship with Eurand or not, but at least he

18    has no records of that in his possession or no information

19    in his possession concerning that when he had his

20    relationship with Medeva or with Eurand indirectly?

21          MR. SCHEFFEL:  Your Honor, this is Robert

22    Scheffel.

23          I had multiple conversations with Dr. Amidon to

24    explore this issue.  He did go back and represented to me

25    that he went back and looked through all of his documents

1    and he told me he has nothing with respect to this.  He

2    represented he did an exhaustive type of search through his

3    documents, it was 15-16 years ago, and he doesn't have

4    anything left.  So I did have those conversations with

5    Dr. Amidon.

6                THE COURT:  Prior to being told this today, were

7    you aware of the UCB case?

8                MR. SCHEFFEL:  I was aware there was a UCB case

9    with Eurand only because of documents that were produced at

10   our request in conjunction with this particular dispute from

11   plaintiffs which established there was some sort of

12   relationship between Eurand and ECB.  I didn't see from any

13   of those documents that they produced to us that Dr. Amidon

14   had any sort of signed obligation.

15               We have requested, even though it's plaintiffs'

16   burden in this instance, we have requested on numerous

17   occasions they provide that specific documentary support,

18   and they stood behind this protective order.

19               We even requested last Thursday that UCB, which

20   is a later third-party to Medeva, agreed to waive the

21   confidentiality agreement or produce some attorneys' eyes

22   only here.  We've been trying to figure it out, but it is

23   the plaintiffs' burden.

24               THE COURT:  Well, I agree with you.  It is the

25   plaintiffs' burden.  I don't think they have necessarily met

1    it with disqualification.

2              But I do think this, though:

3              There is evidence and there is not even a denial

4    on his part that there wasn't a relationship and he wasn't

5    involved in some way of doing some possible evaluation 15-16

6    years ago.  So to the extent he has any information in that

7    regard, any documents, he cannot disclose or testify or

8    comment or rely upon that work that was related to the

9    Medeva aspect.  And I'm putting it with Medeva because it

10   does not -- it appears to me he may or may not be aware of

11   what involvement, of the degree of involvement that Eurand

12   had in its relationship with Medeva.

13             But we do know he had a relationship with

14   Medeva.  Right?  Correct?

15             MR. SCHEFFEL:  Robert Scheffel.  And it was,

16   from what I understand from the discussions, a short

17   consulting arrangement, but yes.

18             THE COURT:  And to the extent he had the

19   consulting arrangement with Medeva, information that he

20   received from Medeva referencing or dealing with

21   methylphenidate -- I hope I have been pronouncing that

22   correctly -- or involving anything having anything to do

23   with the Diffucaps platform of methylphenidate, he is not

24   allowed to use, discuss with you or explore with you, in

25   that regard, the information that he would have received

1    from Medeva in that regard.  But he can remain an expert in

2    this case, because I don't think plaintiff has provided me

3    with enough for disqualification and the two-part inquiry

4    that I have to do in this regard.

5         MR. SCHEFFEL:  Your Honor, this is Robert

6    Scheffel.  If I can add one thing so it's clear for the

7    record with respect to what Dr. Amidon can do.

8         The methylphenidate prior art aspects of this

9    case, including invalidity and inequitable conduct, those

10   are the types of things he would be testifying about.

11   We're talking about prior art, we're not talking about

12   confidential information that's still confidential that he

13   received from Medeva or Eurand.

14        THE COURT:  Well, I'm assuming that if it's

15   confidential, it hasn't been made public; right?

16        MR. SCHEFFEL:  True, Your Honor.

17        THE COURT:  So I'm operating from that aspect.

18   So it's got to be public to be prior art; is that correct?

19   Is that correct, Rob?

20        MR. SCHEFFEL:  Yes, but also known to one of

21   ordinary skill in the art, but that has a public sort of --

22        THE COURT:  -- aspect to it, because if it's

23   confidential and hasn't been disclosed to the world with

24   Eurand except between Eurand and Medeva, in their

25   relationship, it's doubtful it's going to be public.  So to

1    the extent he is called upon to give opinions relating to

2    invalidity in that regard, and recognizing the standards of

3    invalidity, that would fall in that category.  That it would

4    be something he could testify about.  All right?

5              Do the plaintiffs understand what I have

6    indicated?

7              MR. GARRETSON:  John Garretson, Your Honor.

8              I believe so.  And I think you put your finger

9    on the reason why we're concerned.  Regarding the UCB

10   documents, I just wanted to say we are not, plaintiffs are

11   not taking the position, oh, that we're hiding behind the

12   protective order or can't produce something.  This dispute

13   has arisen over the last, I want to say, four or five or six

14   business days.  I understand Mr. Stimart has been trying to

15   get in contact with UCB's attorneys to find out if they will

16   waive that provision, and there would be additional documents

17   that would relate to this and show the relationship that

18   Dr. Amidon had with Medeva and with Eurand.  So with that ...

19             THE COURT:  I'm sitting there saying he is not

20   allowed to disclose what was confidential information that

21   he would have acquired from Medeva.  But to the extent that

22   he is going to give opinions on what is known in the public,

23   and sometimes, you're right, if you are one skilled in the

24   art, it's kind of hard to divide private and public

25   information.  But I've got to believe that if we're talking

1    about prior art references, we're talking about prior art

2    technologies that are out there that would be known to those

3    skilled and be available to them.  That I think the line can

4    be drawn and that he can testify, because it is an objective

5    standard in that regard.

6            So at this stage, I'm going to allow him to

7    testify based upon what I know today, and based upon the

8    information that has been provided by both sides regarding

9    this argument, and in part based upon the age of the time

10   period in which he had an involvement or relationship with

11   Medeva in that regard.

12           On the other issue, however, like I said, I

13   would just like the information by Thursday.  And I'll try

14   to go through it as soon as I possibly can.  And maybe the

15   one way to force me to go through it is to schedule another

16   teleconference so I can tell you what my ruling is.

17           Do you still have the same cutoff date for

18   discovery with Judge Robinson in this case?  Counsel, is

19   that still mid-May?

20           MR. GARRETSON:  Your Honor, John Garretson for

21   plaintiffs.

22           We are trying to figure out what the ultimate

23   dates are going to be.  The parties are currently operating

24   without an order specifically in place from Judge Robinson.

25   We have a kind of a tentatively agreed upon May 14th close

1   of fact discovery in the absence of other motions and other

2   things that might be happening, but for now, May 14th.

3           THE COURT:  But you don't see going beyond that?

4   I may have misunderstood.  Do you see potentially going

5   beyond that date or opening that date up, or not?

6           MR. GARRETSON:  John Garretson again, Your

7   Honor.

8           I think that there are going to be at least some

9   witnesses that are probably going to come after that date,

10  and then there are some defendant specific issues that I

11  think it's difficult to get into on this joint call with

12  everybody.

13          THE COURT:  Sure.  By the way, as I said, in the

14  Bosch case, I'm not certain I gave the -- my one statement

15  in there was necessarily correct.  I just am not 100 percent

16  certain about that.  But I will comment that it didn't make

17  any difference in that case because the exchange had been

18  made with counsel involved, so the issue in the end didn't

19  matter whether it was or was not in the determination, but I

20  did do an in camera review of the materials.

21          So having said that, let's look at a date so

22  that we can talk again and I can likely have this completed

23  by.  So I'm looking at Thursday the 22nd.  What is today?

24  Yes, I'll get it on the 15th.  So if we could talk about

25  again on the 22nd.  And, basically, I'll just tell you what

```
 1    is going to be produced, or if I write something before
 2    that, it gets cancelled.
 3              And, again, remind me, am I dealing with
 4    multiple time zones?
 5              MS. JOHNSON:  Yes, Your Honor.  We're in Chicago
 6    in the Central Time zone here.  Barr.
 7              THE COURT:  All right.  So we're just talking
 8    about an hour's difference is the worst length of time?
 9              MS. JOHNSON:  That's right.
10              THE COURT:  So why don't we schedule this for
11    3:00 o'clock in the afternoon on Tuesday the 22nd?  3:00
12    o'clock Eastern Time.  And since this is Barr and Mylan's
13    concern, one or the other of you can organize this call.
14              MR. MOORE:  Your Honor, this is Dave Moore.
15    I'll circulate the call in.
16              THE COURT:  All right.  Thank you.
17              I have another issue to raise with you.  And
18    this is unrelated to any of the issues that we've talked
19    about in this case.  Is the 08-889 case part of the
20    multi-district cases?
21              MR. GARRETSON:  Yes, Your Honor, it is.  John
22    Garretson.
23              THE COURT:  Okay.  We have an umbrella of cases
24    involved as member cases in the multi-district.  How are we
25    going about preserving information?  And by that, I mean I
```

```
1    know that matters are from filed -- for example, this issue

2    was filed in the 08-889 case, but is there any concern on

3    the part of counsel -- and you don't have to answer me

4    now -- about the filings to be made are only to be made in

5    the multi-district number?  In other words, you file this

6    issue in this case.  If these cases get separated again,

7    this is preserved.  But my concern is what is being filed

8    under the multi-district number?

9              And I'm asking this on behalf of Judge Robinson

10   and myself because we're trying to make certain that the

11   cases involved in this don't get screwed up as far as how

12   the filings are being done by counsel, or how we can help

13   counsel in that regard.  So it's something to think about.

14             All right.  Thank you very much, and I will talk

15   to you next Thursday.

16             (The attorneys respond, "Thank you, Your Honor.")

17             THE COURT:  Good-bye now.

18             (Telephone conference ends at 2:05 p.m.)

19

20

21

22

23

24

25
```